**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

**GEORGIA RIVER NETWORK and
AMERICAN RIVERS,**

**Plaintiffs,**

**LEON COUNTY, FLORIDA,**

**Plaintiff-Intervenor,**

**v.          4:10-cv-267**

**U.S. ARMY CORPS OF ENGINEERS,
LT. GENERAL ROBERT L. VAN
ANTWERP, U.S. Army Corps of
Engineers; COLONEL JEFFREY M.
HALL, U.S. Army Corps of Engineers,
Savannah District; RUSSELL L.
KAISER, U.S. Army Corps of Engineers,
Savannah District,**

**Defendants,**

**GRADY COUNTY BOARD OF
COMMISSIONERS,**

**Defendant-Intervenor.**

<u>**ORDER**</u>

**I.    INTRODUCTION**

On May 28, 2010, the United States Army Corps of Engineers ("Corps") issued the Grady County Board of Commissioners ("Grady County") a permit to construct a 960-acre fishing lake. *See* Doc. 1 at 1.

Plaintiffs Georgia River Network and American Rivers ("Plaintiffs") filed this action to invalidate the permit. *See* Doc. 1 at 49. Plaintiffs are environmental conservation organizations with members residing in Grady County whose enjoyment of the affected lands would be disturbed by the proposed lake. *See* Doc. 1 at 5-6.

Plaintiff-Intervenor Leon County ("Leon County") borders Grady County to the south. *See* Doc. 50 at 2. The project will impound Tired Creek, which joins the Ochlockonee River, potentially affecting the river's water quantity and quantity as it flows through Leon County. *See* Doc. 43-1 at 3. Plaintiffs and Leon County challenge the Corps's permit under the Clean Water Act ("CWA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). *See* Docs. 1; 43-1.

Before the Court are Leon County's "Motion to Consider Extra-Record Evidence," "Motion to Consider 72 Federal Register 220, 64286-64340, and 63 Federal Register 50, 12664-12687," "Motion for Summary Judgment," "Motion for Judgment on the Pleadings," Grady County's "Motion to Amend Answer," "Motion for Summary Judgment," Plaintiffs' "Motion for Summary Judgment," "Motion to Compel Completion of the Administrative Record," and the Corps's "Cross-Motion for Summary Judgment." *See* Docs. 55; 57; 62; 93; 60; 85; 63; 66; 86.

**II.    MOTIONS TO SUPPLEMENT**

**A. Motion to Consider Extra-Record Evidence**

Leon County moves the Court to consider extra-record evidence—two maps—which it claims "show[] how the Tired Creek Project and Lake Iamonia are connected." *See* Doc. 55 at 5. Specifically, Leon County cites the maps as

demonstrating that Lake Iamonia is only fed by the Ochlockonee River when the river is at flood stage. *See id.* at 4. Leon County filed the affidavit of John Kraynak, a professional engineer, to explain the maps. *See* Doc. 54. Leon County contends that the Corps failed to examine the Tired Creek project's effects on the floodwaters that empty into Lake Iamonia. *See* Doc. 55 at 4.

Grady County argues that Leon County failed to show that the proposed extra-record evidence falls under any exception to the rule limiting judicial review to the administrative record. *See* Doc. 68. The Corps also questions the relevancy or need for the evidence, contending that the relationship between the two bodies of water is already addressed in the administrative record. *See* Doc. 73 at 2. The Corps has already agreed there is a connection between Lake Iamonia and the Tired Creek project but disputes the duration and significance of that connection. *See id.* Moreover, the Corps argues that Leon County should have supplemented the administrative record prior to issuance of the permit. *See id.* at 3.

"The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). "The factfinding capacity of the district court is thus typically unnecessary to judicial review of agency decisionmaking." *See id.* at 744.

Under "certain circumstances," a reviewing court may look beyond the administrative record.

For example, supplementation of the administrative record may be appropriate where:

(1) an agency's failure to explain its action effectively frustrates judicial review;
(2) it appears that the agency relied on materials not included in the record;
(3) technical terms or complex subjects need to be explained; or
(4) there is a strong showing of agency bad faith or improper behavior.

*Altamaha Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 2007 WL 1830864, at *2 (S.D. Ga. June 21, 2007) (quoting *Pres. Endangered Areas of Cobb's History, Inc.* ("*PEACH*") *v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n.1 (11th Cir. 1996). "Such exceptions are 'narrowly construed,' however, and the party seeking discovery has 'a heavy burden to show that supplementation is necessary.'" *Kirkpatrick v. White*, 351 F. Supp. 2d 1261, 1272 (N.D. Ala. 2004) (quoting *United States v. Amtreco, Inc.*, 806 F. Supp. 1004, 1006 (M.D. Ga. 1992)).

Leon County contends that the maps fall under the first two *PEACH* exceptions, arguing that the Corps "failed to acknowledge that Lake Iamonia is fed by the Ochlockonee River's floodwaters and not during normal flow" and that the record does not demonstrate "how the [Corps] determined that there was a connection between the Ochlockonee River and Lake Iamonia." *See* Doc. 76 at 3-4.

The Court declines to supplement the record with the two maps and supporting expert affidavit. First, Leon County has not

"provided the court with [any] reason why they could not have provided the same or similar information to the Corps at an earlier time such that the information would have been incorporated into the [administrative record]." *Galveston Beach to Bay Preserve v. U.S. Army Corps of Eng'rs*, 2010 WL 3362266, at *6 (S.D. Tex. Aug. 25, 2010).

Second, "the focal point for judicial review should be the administrative record already in existence, *not some new record made initially in the reviewing court*." *Lorion*, 470 U.S. at 743 (emphasis added). Leon County had a substantial period of time before the issuance of the permit to provide documentation and evidence of its concerns. *See* AR M.6.

Moreover, although seemingly contesting the flood connection, *see* Doc. 86-1 at 40-41, a review of the record and pleadings demonstrates that the Corps does not dispute that Lake Iamonia is fed by flood waters of the Ochlockonee River. *See* Docs. 43-1 at 10; 84 at 6 (admitting that "Lake Iamonia is fed by flood waters of the Ochlocknee River"); 61 at 3; 87 at 3.

The relevant and contested issue raised by Leon County concerns the effect the Tired Creek lake will have on the waters feeding Lake Iamonia. The maps do not show the impact of the project on Lake Iamonia; for instance, the maps do not indicate or provide evidence of how or why the project's effect on downstream water flow will prevent flooding. *See* Doc. 55-1.

Leon County deems it "common sense that a decrease in just 1% of the available downstream flow" could prevent floodwaters from reaching Lake Iamonia.

*See* Doc. 76 at 4. As discussed, the Corps admits that floodwaters flow into Lake Iamonia. Thus, because the maps purportedly demonstrate no more than what the Corps has already admitted, the Court finds it unnecessary to supplement the record with the maps.

Leon County's "Motion to Consider Extra-Record Evidence," *see* Doc. 55, is **DENIED.** Leon County has not satisfied its heavy burden that supplementation is necessary for the Court's review.

**B. Motion to Consider Federal Register**

Leon County beseeches the Court to take judicial notice of sections of the Federal Register that discuss endangered or protected species living in or on the banks of the Ochlockonee River and associated areas. *See* Doc. 57. Leon County did not attach the sections to be noticed to its filing.

Grady County opposes notice on the grounds that the proposed evidence consists of "legislative facts," is irrelevant, and is outside the administrative record. *See* Doc. 69. The Corps responds that it does not "disagree that the Court may take judicial notice of the Federal Register notices cited by Leon County," but reserved their right to contest the notices' relevancy. *See* Doc. 72 at 1.

The Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." FED. R. EVID. 201(c)(2). This rule governs the judicial notice of *adjudicative*, not *legislative*, facts. FED. R. EVID. 201(a). Regardless, 44 U.S.C. § 1507 provides that

the "contents of the Federal Register *shall* be judicially noticed."

This statutory command does not override the evidentiary requirements of relevancy. *United States v. Wolny*, 133 F.3d 758, 765 (10th Cir. 1998). "Irrelevant evidence is not admissible." FED. R. EVID. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401.

The fact that the Federal Register entries are not part of the administrative record does not necessarily preclude this Court from taking judicial notice of them. *See Rohnert Park Citizens to Enforce CEQA v. U.S. Dep't of Transp.*, 2009 WL 595384, at *3 (N.D. Cal. Mar. 5, 2009) (finding it obligatory to take notice of Federal Register entries). Yet, the Court still must determine whether the entries are relevant and, therefore, admissible. *Ctr. for Native Ecosystems v. U.S. Fish & Wildlife Serv.*, 2010 WL 2035580, at *2 (D. Colo. May 20, 2010).

Grady County essentially argues that the Federal Register entries would constitute cumulative evidence, while Leon County cursorily avers that "[t]he Federal Register provides more detailed information" and "conclusively shows that [mussel species] are present in Leon County." *See* Doc. 57 at 3-4. Hindering the Court's determination of relevancy is that the portion of the Federal Register to be noticed consists of seventy-seven pages, most of which is irrelevant to

the Court's determination of the issues before it.

As admitted by Leon County, "[t]he endangered or threatened mussel species and the threat to their designated areas of critical habitat are mentioned throughout the record." *See* Doc. 57 at 3-4. The administrative record already illustrates that the Ochlockonee River, which flows into Leon County, contains endangered and threatened mussel species. *See* AR O.3 at 11 (noting that three federally endangered mussels and one federally threatened mussel species live in the Ochlockonee River); Q.5 (U.S. Fish & Wildlife Service ("FWS") mussel species profiles); M.8.c (specifically referencing the mussel species found in the Florida portion of the Ochlockonee River); O.1 at 36, 53; O.2 at 36-37. Moreover, neither Grady County nor the Corps dispute the possible presence of the mussel species in Leon County.

Nevertheless, Leon County's "Motion to Consider 72 Federal Register 220, 64286-64340, and 63 Federal Register 50, 12664-12687," *see* Doc. 57, is **GRANTED** to the extent it discusses mussel species within Leon County. The Court notes, however, that these entries have relatively little additional evidentiary value because of discussion already existing in the record.

### III.    MOTION TO COMPEL

Plaintiffs seek to compel completion of the record through inclusion of the 2001 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation, Georgia and Florida prepared by the United States Department of Interior (the National Survey). *See* Doc. 66. This motion to

4

complete the record requires a distinct and separate analysis than a motion to supplement the record. *See Weiss v. Kempthorne*, 2009 WL 2095997, at *1-2 (W.D. Mich. July 13, 2009) (comparing the analyses). Plaintiffs have attached the National Survey to their motion. *See* Docs. 66-1; 66-2.

The Corps heavily relied upon a 2007 fishing study by Dr. Michael Maceina ("Maceina") to justify the project need and purpose. AR O.4. The fishing study cited only two sources, one of which was the National Survey, which provided the fishing participation rates. *See id.* at 12. Plaintiffs contend that the National Survey should be added to the administrative record as it was "indirectly" relied upon by the Corps. *See* Doc. 66.

The Corps argues that it did not consider the document when making its decision on the permit at issue, "and thus the document is not properly part of the administrative record." *See* Doc. 78 at 2.

"The district court must have before it the 'whole record' on which the agency acted." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993) (quoting *Appalachian Power Co. v. EPA*, 477 F.2d 495, 507 (4th Cir. 1973). "The complete administrative record consists of all documents and materials *directly or indirectly* considered by the agency." *Id.* (emphasis added).

The designation of the administrative record is entitled to a presumption of regularity. *Id.* at 740. Thus, the Court assumes the Corps properly designated the administrative record absent clear evidence to the contrary. *See id.* "The rationale for limiting the record to those documents directly or indirectly considered by relevant agency decision makers is grounded in the need to afford adequate deference to agency expertise while ensuring meaningful judicial review of the full administrative record." *Ctr. for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1275 (D. Colo. 2010)

Neither party adequately delineates the scope of "indirectly." Neither party offers a case factually on point. "Documents and materials indirectly considered by agency decision-makers are those that may not have literally passed before the eyes of the decision-makers, but were 'so heavily relied on in the recommendation that the decision-maker constructively considered' them." *W. Watersheds Project v. Bureau of Land Mgmt.*, 2012 WL 13937, at *1 (D. Nev. Jan. 4, 2012) (quoting *Salazar*, 711 F. Supp. 2d at 1275-76).

For example, "if a certain study cited in a subordinate's recommendation is shown by clear evidence to have been heavily relied upon in the agency's final decision, then the study should be included in the administrative record even if the final decision-makers did not actually read the study." *Id.* Yet, "merely arguing 'consideration through citation'[1] will not suffice because that 'argument stretches the chain of indirect causation to its breaking point' and it fails to give appropriate

---

[1] "'Consideration through citation' is when a document considered by the agency decision-makers contains references to other documents and it is argued that the cited documents should be included in the record because they were 'indirectly' considered by the agency." *W. Watersheds Project*, 2012 WL 13937, at *1 n.1.

deference to the agency's designation of the record." *Id.* (quoting *Salazar*, 711 F. Supp. 2d at 1277).

The burden rests with Plaintiffs to establish by clear evidence that the Corps has failed to properly designate the record. *See Yuetter*, 994 F.2d at 740.

It is undisputed that the Corps directly considered the 2007 fishing study in its preparation of the environmental assessment. *See* O.4. It is also undisputed, however, that the Corps has never reviewed the National Survey, nor is the survey in its possession. No agency or public commenter raised concerns about the specific FWS participation rates.

The Court is reluctant to require the Corps's inclusion of the National Survey into the record because of the deference owed to the Corps's designation of the record and the potential resource-draining problems inherent in "consideration through citation" arguments. Yet, the study only cites two sources, and Maceina explicitly states in the analysis that he is utilizing the National Survey's fishing participation rates. Therefore, the Court concludes that the Corps constructively considered the National Survey as it pertains to fishing participation rates.

Plaintiffs' "Motion to Compel Completion of the Administrative Record" is *GRANTED*. *See* Doc. 66. The Court considers the Corps' failure to evaluate the National Survey and other alleged deficiencies of Maceina's studies in its subsequent analysis *infra*.

## IV.    MOTION TO AMEND

Grady County moves to amend its Answer to Leon County's Complaint. *See* Doc. 60.

Pursuant to Federal Rule of Civil Procedure 15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

In its motion to intervene, Leon County attached a complaint, *see* Doc. 30-4, but in its later reply, Leon County attached an amended complaint with minor additions. *See* Doc. 43-1. In granting intervention, the Magistrate Judge referenced Leon County's first complaint, *see* Doc. 50 at 1-3, but made no statement regarding the amended complaint.

Notably, the Corps's Answer addresses Leon County's amended complaint, *see* Doc. 84, and correspondingly Leon County's motion for judgment on the pleadings indicates that it believes the amended complaint controls. *See* Doc. 93. Accordingly, because of the apparent uncertainty and the parties' perceptions of which complaint is controlling, the Court will consider the amended complaint as controlling and consents to Grady County amending its answer.

Grady County's "Motion to Amend Answer" is *GRANTED*. *See* Doc. 60.

## V.    MOTION FOR JUDGMENT ON THE PLEADINGS

Leon County filed a motion for judgment on the pleadings, over two months

6

after its motion for summary judgment, on November 4, 2011. *See* Doc. 93.

"After the pleadings are closed . . . a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). "Judgment on the pleadings under Rule 12 (c) is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir. 2002). The Court "must accept all facts in the complaint as true and 'view them in the light most favorable to the nonmoving party'—here, the [Corps]." *Medkser v. Feingold*, 307 F. App'x 262, 264 (11th Cir. 2008).

Reliance or citation to the administrative record does not necessarily require conversion of the motion into a motion for summary judgment. *See, e.g., Washington v. Office of the Comptroller of the Currency*, 856 F.2d 1507, 1511 (11th Cir. 1988); *see also Sch. Bd. of Manatee Cnty., Fla. v. L.H. ex rel. D.H.*, 666 F. Supp. 2d 1285, 1288 (M.D. Fla. 2009).

Leon County contends that the Corps's Answer demonstrates that the "Corps has not conducted a sufficient investigation to determine if the Project will affect Leon County." *See* Doc. 93 at 2. The Corps has pled that it "lacks sufficient knowledge and information to form a belief as to the truth" of many of Leon County's allegations. *See* Doc. 84. Leon County believes these responses illustrate that the Corps has not sufficiently investigated the "potential future effects on water quality in Leon County, quantity of water flowing to Lake Iamonia,

and its effect on endangered or threatened species in Leon County." *See* Doc. 93 at 5.

The Corps responds that Leon County's motion violates the Court's scheduling order, violates the principle of APA record review, and is meritless. *See* Doc. 105.

The parties' original scheduling order contemplated motions to supplement and cross-motions for summary judgment. *See* Doc. 26. In lieu of general guidelines, the parties proposed a schedule based on this action's status as a "review on an administrative record." *See* Doc. 23 at 2.

The amended scheduling order required the plaintiffs to file their motions for summary judgment by August 26, 2011. *See* Doc. 49 at 1. Leon County intervened, and the Magistrate Judge noted "there is no meaningful showing that intervention will disrupt the current litigation schedule under which the current parties are operating." *See* Doc. 50 at 5.

Leon County filed its motion for summary judgment on the deadline date. *See* Doc. 62. Leon County had also filed a motion for additional time to file the summary judgment motion, which the Magistrate Judge subsequently denied. *See* Doc. 77.

The Corps therefore argues that Leon County's motion for judgment on the pleadings violates the spirit of the scheduling order. *See* Doc. 105 at 2. Leon County contends that because the scheduling order did not expressly mention motions for judgment on the pleadings, its motion is not improper. *See* Doc. 108 at 2.

"A schedule may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4).

Leon County chooses to ignore the procedural history and posture of this case. The scheduling order was stipulated to by the original parties, and the Magistrate Judge trusted that Leon County would not disturb this schedule. All parties have filed motions for summary judgment and the administrative record has been filed with this Court. Leon County has even filed motions to supplement the record.

Thus, the Court believes it improper for Leon County to now file the current motion without seeking leave of this Court.

The parties also spar over whether Rule 12(c) motions for judgment on the pleadings are a proper procedural vehicle for judicial review of administrative actions. *See* Docs. 105; 108 at 2. Neither party directs the Court to case law allowing or disallowing the Court's adjudication on the *merits*, in an administrative review case, on a motion for judgment on the pleadings.

Nevertheless, even assuming arguendo that the motion is procedurally proper and considering the merits of the motion, Leon County is not entitled to judgment on the pleadings.

The main foundation of Leon County's argument is that the Corps' responses that it "lacks sufficient knowledge and information to form a belief as to the truth of" specific allegations in Leon County's complaint establishes, as a matter of law, that the Corps failed to give the necessary "hard look" under NEPA. *See* Doc. 93.

Federal Rule of Civil Procedure 8(b)(5) provides: "A party that lacks knowledge or information sufficient to form a belief about the truth of an allegation must so state, and the *statement has the effect of a denial.*" Thus, when examining the pleadings, the Court views each of these responses as denials of Leon County's allegations. Leon County has cited no case law in support of its argument that the Court should disregard the responses' legal effect. In fact, another district court has rejected Leon County's position. *See Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97, 117 n.26 (D.N.H. 2008) (refusing to extrapolate "without knowledge" answers that the Corps' was ignorant and noting that the Court must consider the record in making its determination). Moreover, Leon County does not contend that the actual admissions in the Corps's Answer by themselves establish the Corps's liability.

Therefore, Leon County's "Motion for Judgment on the Pleadings" is ***DENIED***. *See* Doc. 93. Leon County raises the identical substantive arguments in its motion for summary judgment, and thus the Court considers the substance of such arguments in that motion *infra* upon a review of the administrative record.

## VI.   MOTIONS   FOR   SUMMARY JUDGMENT

All parties have moved for summary judgment. *See* Docs. 62; 63; 85; 86. Leon County adopts Plaintiffs' arguments but also raises several arguments independently. *See* Doc. 62 at 5. Summary judgment motions are procedurally appropriate for the Court to review administrative agency decisions.

*Fla. Fruit & Vegetable Ass'n v. Brock*, 771 F.2d 1455, 1459 (11th Cir. 1985) (citation and quotation omitted). As stated *supra*, the district court does not act as a fact-finder. *Fla. Power & Light Co.*, 470 U.S. 729, 744 (1985). Instead, "[t]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Id.* at 743-44.

Plaintiffs and Leon County allege violations of NEPA, CWA, and APA. Plaintiffs argue that "the Corps relied on a flawed fishing study, an incomplete wetlands delineation, and an insufficient environmental analysis." Doc. 63 at 3. Plaintiffs insist that the Corps failed to adequately consider the impacts of the project on wildlife, fish, and historic properties outside the proposed lake site. *See id.* at 6. Moreover, they aver that the Corps failed to evaluate or inadequately considered the environmental impacts of the bridge replacements, road realignments, and foreseeable development that would result from the lake's construction. *See id.* Leon County additionally claims that the Corps failed to properly consider the proposed lake's effects on endangered and threatened mussel species in Leon County and floodwaters that recharge Lake Iamonia. *See* Doc. 62.

### A.  Background

In May 2005, Grady County submitted a permit application to the Corps for construction of a 1,225 acre lake. AR F.1. The stated project purpose was to develop a mixed-use, water-based, master-planned community to promote economic development in the County and to provide for recreational and leisure uses. AR F.1a at 3. In June 2005, the Corps requested that Grady County perform a wetlands delineation for the proposed 1,225 acre lake. AR E.4. Grady County contends the May application was for "purposes of agency comment only." *See* Doc. 85-2 at 2.

In November 2005, Grady County submitted a revised Section 404 application for a 960 acre lake, along with a revised alternatives analysis and a Jurisdictional Waters Report. AR F.2. The stated project purpose was "[t]o construct a lake that will provide for the public fishing and water-oriented recreation needs of Grady county and the surrounding region and also serve as a catalyst for economic development in Grady County through tourism and ancillary development." AR F.2.a at 3.

Grady County once again submitted a revised application on August 30, 2006. AR C.5 at 1-2. Grady County explained that the project purpose was "[t]o construct a lake of sufficient size that will provide for the present and future public fishing needs of Grady County and the surrounding region and, incidentally, promote ancillary economic development. AR D.2 at 2. Grady County submitted a study, "Analysis of Available and Future Angler Supply and Demand Opportunities for the Proposed Tired Creek Public Fishing Lake," to demonstrate the unmet fishing needs in a 50 mile radius around the proposed project site. *See* Docs. 86-2 at 3; 94-2.

On September 13, 2006 the Corps published a Joint Public Notice ("JPN") for

the 960 acre lake.   AR G.5.   On June 27, 2007, the Corps conducted an interagency site inspection of the proposed project area. *See* Doc. 51-3.   As a result of the inspection, the Corps concluded that the project would impact a total of 129 acres of wetlands.   AR D.6 at 1; O.1 at 2.

In response to agency concerns, the Corps requested that Grady County analyze the unmet demand for fishing trips by County residents alone, so Grady County submitted a revised study in 2007.   AR O.4. This study determined that there was an unmet demand for angler fishing trips among Grady County residents in 2010 of 12,300 to 13,300 trips per year and that demand would increase in future years.   *Id.* at 9-10.   After the EPA provided information about the decline in fishing licenses in the United States, the Corps revised the fishing trip deficit amount downwards by twenty percent to a 2010 deficit of 9,840 to 10,640 trips per year.   AR O.1 at 5.

Again, after agency comments, Grady County commissioned three University of Georgia professors, James L. Shelton, Susan B. Wilde, and Todd C. Rasmussen, to prepare a revised alternatives analysis.   *See* I.4; I.5.   Grady County likewise submitted a revised compensatory mitigation plan in November 2009.   AR O.10-12.

On April 20, 2010, the EPA communicated to the Corps that it still had concerns regarding the project and desired an environmental impact statement (EIS) from the Corps.   AR M.1.d at 3-8.   In May 2010, the Georgia Department of Natural Resources ("DNR") issued a Section 401 water quality certification.   AR P.2.e.   On May 10, 2010, the Corps made a finding of no significant impact (FONSI) and recommended issuance of the permit with general and specific conditions.   AR P.1. By letter to the Corps dated May 25, 2010, the EPA consented to the Corps's decision, and it expressed that it would not elevate the permit for review under its CWA Section 404(c) authority, requesting only that there be further coordination if the permit conditions were modified or additional issues arose.   AR M.1.d at 1.

On May 28, 2010, the Corps issued a Clean Water Act Section 404 permit to Grady County for the construction of an earthen dam and 960 acre public fishing lake on Tired Creek in Grady County, Georgia. *See* AR P.2a.   The proposed lake is on a 2,888 acre tract of land owned by Grady County.   AR O.1 at 7.

### B.   Legal Framework

#### 1.   *National Environmental Policy Act*

The National Environmental Policy Act ("NEPA") has "twin aims."   *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council*, 462 U.S. 87, 97 (1983).   First, NEPA forces government agencies to "consider every significant aspect of the environmental impact of a proposed action." *Id.* (quotation omitted).   Second, NEPA mandates that government agencies inform the public of the potential environmental impacts of proposed actions and explain how their decisions address those impacts. *Id.*

"NEPA establishes procedures that a federal agency must follow before taking any action." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008). NEPA sets "forth no substantive limits on agency decision-making," but "only requires that the agency follow a certain process in deciding whether to take the action." *Id.* at 1361. For instance, "it would not violate NEPA if the EIS noted that granting the permits would result in the permanent, irreversible destruction of the entire Florida Everglades, but the Corps decided that economic benefits outweighed that negative environmental impact." *Id.* at 1361-62.

NEPA created the Council on Environmental Quality ("CEQ"), *see* 42 U.S.C. § 4342, and the CEQ promulgated regulations implementing NEPA that are binding on all federal agencies. 40 C.F.R. § 1507.1. Additionally, the Corps has promulgated its own regulations providing guidance for the implementation of NEPA. 33 C.F.R. § 230.1-App'x C.

To comply with NEPA, the Corps must first determine whether the action is a "major" federal action with a "significant effect." *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1214-15 (11th Cir. 2002). This determination generally requires preparation of an environmental assessment ("EA"). *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998); 40 C.F.R. § 1501.4.

The EA is a brief document containing sufficient evidence and analysis that allows the agency to determine whether to prepare a more detailed statement of environmental consequences, known as an Environmental Impact Statement ("EIS"). 40 C.F.R. § 1501.4; *id.* § 1508.9. The EA must "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Id.* § 1508.9(b). This review includes both the direct and indirect impacts. *Id.* § 1508.8. "The EA should provide enough evidence and analysis to guide the agency to one of two conclusions: (1) a finding that the project will have a significant effect, or (2) a finding of no significant impact ('FONSI')". *Sierra Club*, 295 F.3d at 1215.

If the Corps decides that the environmental consequences of the action are not sufficient to justify the preparation of an EIS, the agency must prepare a FONSI "briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.13.

If the conclusion in the EA is that the action will have a significant effect, then the project is "major," and the Corps must prepare an EIS. *Sierra Club*, 295 F.3d at 1215. In preparing an EIS, the Corps must consider:

(i)   the environmental impact of the proposed action,

(ii)  any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

11

(iv)  the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v)  any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).

A court can only find a federal agency's attempted NEPA compliance inadequate where it is arbitrary, capricious, or an abuse of discretion in violation of the APA. This standard requires substantial deference to the agency, not only when reviewing decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue.

*Van Antwerp*, 526 F.3d at 1361.

The Eleventh Circuit has enunciated four criteria to be considered in determining whether the Corps's decision not to prepare an EIS was arbitrary and capricious:

(1) the [Corps] must have accurately identified the relevant environmental concern; (2) the [Corps] must take a "hard look" at the problem in preparing an EA; (3) if a FONSI is

made, the [Corps] must be able to make a convincing case for its finding; and (4) if the [Corps] does find an impact of true significance, preparation of an EIS can be avoided only if the [Corps] finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Hill*, 144 F.3d at 1450

In determining whether the Corps complied with NEPA, the Court should determine whether the Corps took a "hard look" at the effects on the environment of the proposed action. *Sierra Club*, 295 F.3d at 1216. The Corps will not have undertaken the requisite "hard look" if:

(1) the decision does not rely on the factors that Congress intended [the Corps] to consider; (2) the [Corps] failed entirely to consider an important aspect of the problem; (3) the [Corps] offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of [Corps] expertise.

*Id.* at 1216.

2.  *Clean Water Act*

The Clean Water Act (CWA) was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA generally prohibits the discharge of pollutants, including dredged or fill material, into the waters of the United

States. *See id.* § 1311(a). Section 404 of the CWA, however, authorizes the Secretary of the Army, acting through the Corps of Engineers, to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters . . . ." *Id.* § 1344(a). Because wetlands are considered "waters of the United States," they are within the jurisdiction of the CWA, and thus a permit from the Corps is required to dump fill or dredged material into wetlands. *See Sierra Club v. Van Antwerp,* 661 F.3d 1147, 1150 (D.C. Cir. 2011).

All CWA Section 404 permits must meet the "404(b)(1) Guidelines," issued by the EPA and Corps and codified at 40 C.F.R. § 230. *See* 33 U.S.C. § 1344(b)(1); *see also* 33 C.F.R. § 320.4(b)(4).

These guidelines state in relevant part that (1) "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States"; (2) "no discharge or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences;" and (3) "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. §§ 230.10(a), (c), & (d).

If the district engineer determines that the proposed discharge would comply with

the 404(b)(1) guidelines, he will grant the permit unless issuance would be contrary to the public interest. 33 C.F.R. § 320.4(a)(1).

The public interest review is "based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." *Id.* The Corps must balance "benefits which reasonably may be expected to accrue from the proposal" against the proposal's "reasonably foreseeable detriments." *Id.* § 320.4(a)(1).

A broad range of potential impacts are implicated in the public interest review, including "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." *Id.*

Moreover, in the evaluation of every permit, the Corps must consider:

"(i) The relevant extent of the public and private need for the proposed structure or work; (ii) Where there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and (iii) The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work

is likely to have on the public and private uses to which the area is suited."

*Id.* § 320.4(a)(2).  Permits should contain such special conditions as are necessary to satisfy applicable statutory and public interest requirements.  *Id.* § 325.4(a).

### 3. *Standard of Review*

The Corps's decision to grant the Section 404 permit is subject to judicial review under the APA.

Pursuant to the APA, the Court can "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "[T]his standard is exceedingly deferential . . . ."  *Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 541 (11th Cir. 1996).  "The reviewing court may not substitute its judgment for that of the agency but must, instead, defer to the agency's technical expertise."  *City of Oxford, Ga. v. F.A.A.,* 428 F.3d 1346, 1352 (11th Cir. 2005); *see also Coal. on Sensible Transp., Inc. v. Dole,* 826 F.2d 60, 66 (D.C. Cir. 1987) ("The NEPA process involves an almost endless series of judgment calls. . . . The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts.").

This Court is "required to determine whether the Corps' decision was *reasonably supported* by the information before it.  This does not require that all of the data support the agency's decision."  *Envtl. Coal. of Broward Cnty. v. Myers,* 831 F.2d 984, 986 (11th Cir. 1987).  "Nevertheless, the agency must examine the relevant data and

articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).

### C. Analysis

#### 1. *Project Purpose and Need*

Plaintiffs contest the Corps' determination of unmet fishing demand justifying the Tired Creek lake project. They argue that the Corps acted arbitrarily and capriciously in relying on the 2007 Maceina Study, the findings of which constituted the major basis for the Corps's determination of a public need for the fishing lake.  *See* Doc. 63 at 9.

Grady County commissioned Maceina, an expert in fisheries and aquatic sciences at Auburn University, to analyze fishing demand.

In 2002, Maceina and Mike Gennings, former Chief of Fisheries Management for Georgia DNR, undertook an angler supply and demand study to determine need for a public fishing lake in Grady County.  AR I.2 at 3; I.3 at 4.

Maceina derived the need for a fishing lake by examining the population residing within a 50-mile radius of the proposed lake. *See id.*  Within this area, including thirteen Georgia and three Florida counties, the existing venues for recreational fishing and the percentage of the population engaging in recreational fishing were evaluated.  *See id.* The study found an angler trip deficit of

14

153,664 trips per year. *See* Doc. 96-8 at 2. This conclusion was based on the exclusion of Lakes Iamonia, Jackson, and Miccosukee because drought conditions cause fish kills and prevent angler access about 20% of the time. *Id.* When the lakes were included in the analysis, the study found a surplus of fishing opportunities. *Id.* at 1.

In 2006, Maciena prepared another report to determine future fishing needs. *See* AR I.3 at 4-5; Doc. 94-2. The 2006 study included trips supplied by Lakes Iamonia, Jackson, and Miccosukee in Florida, and it used population projections to estimate the future demand for fishing trips. AR I.3 at 5. Maceina concluded that in 2005 there was an unsatisfied fishing demand of 280,924 trips per year in the 50-mile radius, and there would be an unsatisfied demand of 929,685 trips per year by 2030. *See* Doc. 94-2 at 12.

By letter dated July 20, 2006, Georgia DNR Chief of Fisheries Dan Forster, after inquiry from the Corps, responded that Grady County had "adequately documented existing and future demand for fishing opportunities in the 50-mile radius surrounding the proposed lake site. Furthermore, the fishing demand analysis conducted by Dr. Michael Maceina utilized techniques recognized by our staff as appropriate for estimating fishing demand." AR O.6 at 1-2. The Corps relies heavily on this endorsement to support Maceina's methodology and the corresponding finding of a public fishing need.

Nevertheless, the Corps received agency concerns regarding the 2006 study, particularly Maceina's inclusion of Floridians. In an October 10, 2006 letter, Keith Parsons ("Parsons") of the Environmental Protection Division (EPD) of the Georgia DNR questioned whether the project would attract any of the perceived fishing trip deficit "given the highly competitive opportunities already existing in Florida." AR M.3.j at 1.

The EPA responded to Maceina's 2006 study by remarking that the sale of fishing licenses had not been increasing. AR M.1.a at 2. Moreover, the EPA noted:

> [T]he only significant population growth for the study area is in the Tallahassee-Leon County area of Florida. It is unclear if Floridians will make a significant number of trips to Grady County to use the reservoir, since they will be required to obtain an out-of-state license and may have closer fishing opportunities.

*Id.*

In an October 12, 2006 letter, the Georgia Conservancy likewise questioned whether Florida residents would come fish in the proposed lake, especially with other available fishing opportunities at Lake Seminole on the Georgia/Florida border and along the Gulf Coast. AR M.8.d at 4.

In January 26, 2007, the Corps expressed to Grady County that "it appears that your proposed project may not be the least environmentally damaging practicable alternative to meet the basic project purpose." *See* Doc. 51-2 at 2. Moreover, due to the federal and state agency concerns about "use of population and fishing demand from outside of Grady County", the Corps

requested that Grady County "further isolate the unmet demand for public fishing, by examining unmet fishing demand within Grady County alone." AR O.1 at 5.

Thus ensued Maceina's October 2007 study, "Analysis of Available and Future Angler Supply and Demand Opportunities for the Proposed Tired Creek Public Fishing Lake." AR O.4. In the study, Maceina concluded that public fishing demand in Grady County was 47,190 trips per year in 2010. *Id.* at 9. Maceina calculated that the Tired Creek lake could supply a maximum of 12,480 trips per year. *Id.* at 10.

In an April 29, 2008 report, the Corps's Engineer Research and Development Center (ERDC) critiqued Maceina's 2007 Fishing Study. Although stating that "[t]he analysis of angler supply and demand is useful and demonstrates local need for a fishing lake," the report also noted that the study was "flawed in its assumptions and probably represents an overestimate of need." AR K.2 at 4. Moreover, the report remarks that the study "ignore[s] long-term trends in the number of US anglers and in gasoline prices." *Id.* It also states that "[d]eficits in fishing opportunities used to justify project must address long-term changes in number of anglers and financial constraints in travel. This will require multiple simulations." *Id.* Maceina had noted however that "increasing energy costs for transportation" could "cause the demand for more local available fishable water bodies to increase over time." AR O.4 at 11.

In April 20, 2010, the EPA informed the Corps that it had "significant concerns about this project purpose" including "what has

been modeled to be the current and future fishing demand for Grady County." AR M.1.d. at 4. The EPA recommended that the Corps "conduct a detailed evaluation of the Applicant's fishing needs models, and an assessment of the proposed project purpose as it relates to a realistic fishing demand for Grady County and the immediate surrounding area." *Id.* The Corps never undertook a subsequent "detailed evaluation." *See* Doc. 63 at 18.

Instead, in response to EPA concerns about declining sales of fishing licenses, the Corps extrapolated a twenty percent decline in the number of fishing licenses issued countrywide and accordingly reduced Maceina's figures by twenty percent to conclude that the "2010 deficit would still be between 9,840 to 10,640 trips per year and the 2030 deficit would be 37,752 per year." AR O.1 at 5. The Corps utilized these statistics in undertaking its alternatives analysis to determine whether the project was the least environmentally damaging practicable alternative. *See* AR O.3.

The Corps contends that Plaintiffs failed to raise their concerns regarding the 2007 Fishing Study during the comment period and are now completely precluded from contesting it. *See* Docs. 86-1 at 21; 106 at 4-5. Plaintiffs counter that they are free to contest the 2007 Study because the EPA, the Corps's ERDC, and others contested the study and the needs analysis. *See* Doc. 94 at 17.

"A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the

16

[agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Unemployment Comp. Comm'n of Territory of Alaska v. Aragon*, 329 U.S. 143, 155 (1946).

Parties generally must "structure their participation [during the comment period] . . . so that it alerts the agency to the [parties'] position and contentions." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553–54 (1978). "Claims not properly raised before an agency are waived, unless the problems underlying the claim are 'obvious,' or otherwise brought to the agency's attention." *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1170 (10th Cir. 2007) (internal citation and quotation omitted).

"A party that did not participate in the administrative process may challenge the agency's decision in court so long as the party raises issues that were submitted by others during the administrative process." *See Choate v. U.S. Army Corps of Eng'rs*, 2008 WL 4833113, at *5 (E.D. Ark. Nov. 5, 2008); *see also Wyo. Lodging & Rest. Ass'n v. U.S. Dep't of Interior*, 398 F. Supp. 2d 1197, 1210 (D. Wyo. 2005) ("[A]n EA's or an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action.").

Here, although Plaintiffs never raised particular concerns regarding Maceina's 2007 study, the Corps had notice of concerns regarding the study. Notwithstanding the earlier concerns regarding the 2006 study, in April 2010, the EPA expressed that it "continue[d] to have

significant concerns about this project purpose" and "what has been modeled to be the current and future fishing demand for Grady County." AR M.1.d at 4. The EPA remarked that it would gather information on the fishing demand and recommended the Corps "conduct a detailed evaluation of the Applicant's fishing needs models, and an assessment of the proposed project purpose as it relates to a realistic fishing demand." *Id.*

Thus, the Corps was aware of the EPA's concerns regarding the needs analysis and the purported fishing demand as embodied in Maceina's study. Therefore, Plaintiffs are free to contest Maceina's 2007 study.

The Corps notes that it must respect Grady County's stated project purpose of building a fishing lake to satisfy fishing demand. *See* Doc. 86-1 at 12-13. Moreover, the Corps states that it must respect the opinion of the Grady County Board of Commissioners that there is an unmet fishing demand as they are uniquely qualified as local elected officials to evaluate such need. *See id.* at 13.

Plaintiffs claim that the Corps may not completely defer to the applicant's stated project purpose and that the Corps does not point to any community surveys, interviews, or hearing transcripts to substantiate the Board's determinations. *See* Doc. 94 at 11.

Before the Corps can issue a Section 404 permit, the Corps must determine whether any less environmentally detrimental alternatives will accomplish Grady County's goal. *See* 40 C.F.R. § 230.10(a). "In making this assessment, the Corps must carefully define what it is that the applicant

is proposing to do. This process—defining the project purpose is, therefore, a critical first step to the Corps' proper evaluation of practicable alternatives." *Fla. Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236, 1243 (M.D. Fla. 2008).

The Corps is correct that it must respect Grady County's stated project purpose. Although the Corps may not "blindly accept the applicant's statement of project purposes," the Corps must "take into account the objectives of the applicant's project," and the Corps may not "ignore an applicant's stated project purpose." *D'Olive Bay Restoration & Pres. Comm., Inc. v. U.S. Army Corps of Eng'rs*, 513 F. Supp. 2d 1261, 1269 (S.D. Ala. 2007) (quotation omitted).

Nevertheless, the Corps's own regulations state that "the Corps, will in all cases, exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective." 33 C.F.R. § 325 app. B § 9(c)(4); *see also Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005) (warning against an agency's reliance on "[r]epresentations by the applicant alone, who clearly has an interest in obtaining the permit" and extolling "independent evaluation by the agency based on record evidence").

In the EA, the Corps determined that the basic project purpose "is to provide recreational fishing opportunities necessary to meet the unmet Grady County demand." AR O.1 at 5. Moreover, the overall project purpose is "the development of a sustainable public fishing area that would provide a variety of recreational fishing experiences to address the local unmet recreational fishing demands of the current residents of Grady County and as much of the predicted demand for 2030, as possible." AR O.1 at 5.

As demonstrated, Maceina's studies, particularly the 2007 study, form the basis for the Corps's determination of a need for a fishing lake. The Corps *must* consider as part of its public interest review "[t]he relative extent of the public . . . *need* for the proposed . . . work." 33 C.F.R. § 320.4(a)(2)(i) (emphasis added). The Corps argues that it only must determine the relative need. *See* Doc. 86-1 at 12.

The Corps may rely on documents submitted by Grady County. *See Nat'l Wildlife Fed'n v. Souza*, 2009 WL 3667070, at *18 (S.D. Fla. Oct. 23, 2009) ("The Corps's regulations do not require the Corps to undertake an independent investigation or to gather its own information upon which to base an . . . [EA]." (quoting *Friends of the Earth v. Hintz*, 800 F.2d 822, 834 (9th Cir. 1986))). But, the Corps must independently evaluate the documents submitted. *See Fla. Wildlife Fed'n*, 401 F. Supp. 2d at 1323.

Plaintiffs launch a grapeshot attack against Maceina and his 2007 study—the gist of which is that the Corps failed to independently evaluate the study.

First, Plaintiffs contend that Maceina was unqualified to conduct the study as he is an expert in fisheries biology, not a "relevant field" such as recreational management. *See* Docs. 63 at 12; 94 at 10 n.3. The Corps contends that the study was within his area of expertise of fisheries

management and that no other indicia of unreliability arose for the Corps to question his credentials. *See* Doc. 86-1 at 15-16. Nothing in the record suggests that concerns over Maceina's qualifications, rather than the assumptions and variables in his study, were ever raised by anyone, including Plaintiffs. Moreover, in approving the methodology used, the Georgia DNR Chief of Fisheries raised no concerns regarding Maceina's qualifications to conduct the study. AR O.6 at 2.

Plaintiffs also argue that Maceina based his study on a number of flawed assumptions. First, Maceina allegedly erred in assuming that children under five fished at the same rate as the rest of the population. *See* Doc. 63 at 16. The second alleged error was Maceina's assumption that people in the nearby Florida counties would fish at the same rate in Grady County as they would in Florida, notwithstanding the need to obtain a Georgia fishing license and the availability of several close public fishing areas. *See id.* at 16-17.

The Corps responds that even if the study "slightly" overestimates the number of fishing trips by including young children, the conclusion that there is ample unmet demand remains. *See* Doc. 86-1 at 17. Also, the Corps argues that it was reasonable to determine that Florida anglers would use the lake because Georgia licenses are inexpensive, certain days and particular groups do not require licenses, Lake Seminole is sometimes unavailable and the proposed lake would be closer to Tallahassee than Lake Seminole. *See id.* at 17-18.

Plaintiffs reply that nothing in the record supports Lake Seminole's unavailability or that Florida residents would travel to Tired Creek lake over Lake Seminole. *See* Doc. 94 at 13. The Corps responds that given Grady County's close proximity to Florida as a whole and Leon County in particular, "it is highly likely that the percentage of non-resident fishing trips in Grady County will be much higher than for the State as a whole." Doc. 106 at 4. Nothing in the record supports the Corps' assertion.

Moreover, Plaintiffs contend the Corps should have verified the 2001 National Survey, relied upon in Maceina's 2007 Study. *See* Doc. 63 at 12. Plaintiffs claim the survey demonstrates Maceina overestimated the number of Florida residents that would use the Tired Creek lake. *See* Doc. 66 at 5-6. As the Corps argues, no law or regulation requires the Corps to independently verify each source in a submitted study, *see* Doc. 86-1 at 15, but the Corps still must independently evaluate and verify the applicant's findings. *See* 40 C.F.R. § 1506.5(a).

Plaintiffs argue that the National Survey's utilization of an increased fishing participation rate runs contrary to declining fishing license sales, *see* AR O.1 at 5, and to a July 2001 study in the record, by recreational research firm Responsive Management, entitled "Maintaining and Increasing Fishing Participation and Fishing License Sales in Georgia," which concluded that approximately eleven percent of Grady County residents have fishing licenses. AR N.2 at 75.

The Corps responds that the study was created using a different methodology than Maceina's 2007 Fishing Study and prepared for the Georgia DNR. *See* Doc. 86-1 at 17. The Georgia DNR did not criticize the methodology in the 2007 Fishing Study. *See* AR M.3. After obtaining the DNR's approval of the 2006 study's methodology, the Corps did not specifically ask for the DNR's review of the 2007 study. *See* AR M.3.d-e. (requesting the DNR's opinion on fishery productivity and the impact of intensively managed bodies on downstream water quality).

In support of their reliance on the 2007 study, the Corps states that "the 2007 Fishing Study was *not* the sole basis for the Corps' determination of need. Rather, that determination was based on multiple lines of evidence", including Maceina's 2002 and 2006 studies. *See* Doc. 86-1 at 14, 18-19. In the record, the Corps cites to all three studies. AR O.1 at 5; O.3 at 3-4.

Plaintiffs contest the Corps and Grady County's reliance on the 2002 study. First, Plaintiffs argue the questionability of reliance on such a study because this study was not part of the administrative record submitted to the Court, neither defendant produced a copy of the study when document requests were made, and the Corps stated that the 2002 study was not in its files. *See* Doc. 94 at 3.

Moreover, the 2002 study seems to conflict with Maceina's later studies. The 2002 study utilized fishing rate percentages of 15.7% for Georgia residents and 11% for Florida residents, and only found a fishing deficit when it excluded three Florida lakes—Iamonia, Jackson and Miccosukee—from the analysis. *See* Doc. 96-8 at 2.

Grady County contends that the 2002 study's findings were not confined to Grady County as was the 2007 study. *See* Doc. 107 at 5. Moreover, the 2002 study utilized the 1996 FWS survey's fishing participation rates, which were lower than the 2001 National Survey's rates. *See id.* at 3.

Plaintiffs also aver that the Corps did not include the 2006 study in the record. *See* Doc. 94 at 9. Moreover, although the 2002 study found a surplus when the three Florida lakes were included, the 2006 study includes the lakes but found a fishing trip deficit. *See id.* at 6.

Grady County explains these differences by pointing to the 2006 Study's reliance on a population increase and an updated 2001 National Survey, which found fishing participation rates to be twenty-two (22) percent. *See* Doc. 107 at 4; AR O.4 at 6.

The Corps states it had no basis for questioning the participation rates published by the FWS. *See* Doc. 106 at 6. The Corps maintains it did not *rely* or *base[] its decision* on the 2002 and 2006 studies for its analysis of need. *See id.* at 5-6. Nevertheless, it avers that those studies are *consistent* with the 2007 Study; thus the Corps had no need to second-guess the 2007 Study. *See id.* Such contention implies that the Corps reviewed those studies at some point. The Corps relied on the 2007 study's findings in its analysis. *See* AR O.1 at 5; O.3 at 3-4.

Plaintiffs also aver that the Corps failed to respond to criticism of Maceina's studies. *See* Doc. 63 at 17-19. When information

submitted by the applicant is "specifically and credibly challenged as inaccurate, the Corps has an independent duty to investigate." *Van Abbema v. Fornell*, 807 F.2d 633, 642 (7th Cir. 1986). "The Corps . . . must demonstrate that it has considered significant comments and criticisms by explaining why it disagrees with them; it may not dismiss them without adequate explanation." *Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 606 F. Supp. 2d 121, 132 (D.D.C. 2009). But, the Corps does not have to commission studies concerning the validity of every objection raised. *See Little Lagoon Pres. Soc., Inc. v. U.S. Army Corps of Eng'rs*, 2008 WL 4080216, at *26 (S.D. Ala. Aug. 29, 2008).

Yet, the Corps responded to concerns regarding the fishing study from the EPA (AR M.1a; M.1d; O.1 at 10-15), Georgia DNR (AR M.3j; O.1 at 38) and the Georgia Conservancy (AR M.8d; O.1-O.2 at 54-56). The Corps argues that no commentator offered an alternative analysis demonstrating lower or no current demand. *See* Doc. 86-1 at 22. Specifically, the Corps responded to concerns over the 2006 study by requiring Grady County to commission an additional study to gauge unmet fishing demand in Grady County alone. AR O.1 at 5. The Corps did not blindly adopt the Maceina study; it received validation of the 2006 study's methodology from the Georgia DNR because Maceina had utilized DNR methodology. *See, e.g.,* Doc. 96-11 (study utilizing similar methodology to determine fishing supply and demand in Macon, Georgia area).

The Corps's obtaining the DNR's validation of Maceina's methodology was reasonable. *See also* O.2 at 19 (noting that the "methodology has been accepted by EPA for other 404 permits issued to GA DNR for the construction and operation of public fishing areas"). Even after the 2007 study, the Corps, recognizing the EPA's expressed concerns over declining fishing licenses nationwide, adjusted Maceina's conclusions downwards by twenty percent. The Corps also met with the EPA in April 2010 to discuss the EPA's continued concerns with the project. *See* AR O.2 at 25. Moreover, Plaintiffs overstate the ERDC's critique. Although the ERDC postulated that the 2007 study overestimated need, the ERDC also noted that the study was useful and demonstrated local need. AR K.2 at 4.

"[T]he Court must defer to the expertise of the agency in evaluating the needs and objectives of the proposed action." *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 666 (D. Md. 2007). Because the Corps obtained DNR's validation of Maceina's methodology, required an additional study after agency concerns over Maceina's 2006 study, and adjusted Maceina's findings to reflect declining license sales, the Corps's determination of unmet 2010 fishing demand was not arbitrary and capricious. *See also Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1004 (D.C. Cir. 1997) (where an agency is faced with the choice of proceeding on the basis of imperfect data or investing the resources to conduct the perfect study the agency's choice will be held to be arbitrary and

capricious only "if there is 'simply no rational relationship' between the model chosen and the situation to which it is applied.").

Finally, Plaintiffs aver that the Corps misinterpreted Maceina's findings by concluding that Grady County would have a fishing trip deficit of 47,190 trips in 2030. AR O.1 at 5; O.3 at 4.  Plaintiffs contend that Maceina found a 47,190 fishing trip demand, not deficit, for 2010.  AR O.4 at 8-9.

Grady County contends that "*all* public demand in Grady County is *unmet* and is deficit." *See* Doc. 85-1 at 19.

Nevertheless, Maceina's 2007 study did not calculate the demand for 2030. Moreover, the record, at least from the Corps's perspective, does not imply as Grady County suggests that the 47,190 figure amounts to unmet demand. *See* AR O.1 at 5 (noting that 2010 deficit in Grady County would be between 9,840 to 10,640 trips per year).

Therefore, the Corps admittedly erred in stating that there would be an unmet 47,190 fishing trip demand in Grady County in 2030. *See* AR O.1 at 5. The Corps contends such error is harmless as the actual deficit, 25,000 to 30,000 in 2030, supports the existence of unmet demand for fishing trips. *See* Doc. 86-1 at 16.

Grady County argues that the alternative analysis demonstrates that 2030 fishing demand to be at least 60,583 trips. *See* AR I.3 at 5; Doc. 85-1 at 19.  Plaintiffs argue that the new, post-hoc figures are unsubstantiated and conflicting. *See* Doc. 94 at 15.

Whether the Corps is correct or not, the Court cannot base its review on numbers belatedly calculated. "Post-decision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007) (quoting *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)). "[A] court can only uphold the decision of an administrative agency on those grounds 'upon which the record discloses that its action was based.'" *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 835 (D.C. Cir. 2000) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

The Court will examine the 2030 calculation error in the alternatives analysis discussion *infra*.

### 2. Alternatives Analysis

Plaintiffs argue that the Corps's alternative analyses under both the CWA and NEPA are deficient because they are based on meeting a flawed determination of need. *See* Doc. 63 at 19. The alternatives analyzed included two off-site alternatives on Barrett's Creek, a no-action alternative, a 196-acre lake on Black Creek, a 420-acre lake on Black Creek, a 1,225-acre lake on Tired Creek, and a 535-acre public fishing area on Tired Creek. AR O.2 at 26-27. The Corps determined that the 960-acre Tired Creek fishing lake was the least environmentally damaging practicable alternative. *Id.* at 27; O.3 at 30.

Pursuant to 404(b)(1) Guidelines, the Corps must consider whether "there is a practicable alternative to the proposed

discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). If the project is not "water dependent," there is a presumption that there is a practicable alternative that does not impact waters of the United States. *Id.* § 230.10(a)(3). NEPA also requires the Corps to consider alternatives. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1508.9(b) (requiring inclusion of alternatives analysis and discussion in EA).

The alternatives analysis for NEPA "will in most cases provide the information for the evaluation of alternatives under [the CWA's] Guidelines." 40 C.F.R. § 230.10(a)(4). But, while both NEPA and the CWA require the Corps to undertake an evaluation of alternatives, it is the CWA that directs the Corps toward selection of alternatives that pose less detrimental environmental impacts. *Id.* § 230.10(a).

Grady County argues that the alternatives analysis demonstrates the Corps' scrutiny and verification of project need. *See* Docs. 85-1 at 20-23; 107 at 6-7.

After concerns expressed by the Corps that the proposed lake was not the least environmentally damaging practicable alternative, *see* Doc. 51-2, Grady County hired three fisheries consultants from the University of Georgia (UGA) to prepare a revised alternatives analysis. *See* AR I.4; AR O.3 at 6; AR O.20-22.

As part of his fishing demand analysis, Maceina utilized Georgia DNR methodology that water bodies less than 500 acres can supply 75 angler-trips per acre per year whereas water bodies of more than 500 acres support a maximum of 13 angler-trips per acre per year. *See* AR O.4 at 7. In their alternatives analysis, the UGA professors developed a different formula for calculating the number of angler visitation trips per acre per year a particular body of water could support. *See* AR O.20 at 38, 42.

A review of their analyses does not indicate they revisited or reevaluated Maceina's determination of local or area unmet fishing demand; instead, they recalculated how many fishing trips alternative lake sites would provide. Neither the professors, nor Grady County, nor the Corps indicate how the new formula affects Maceina's demand study. Thus, Grady County's contention that the professors' alternatives analysis supports Maceina's need determination appears unfounded.

As noted previously, the Corps erred in determining the 2030 fishing demand. The Corps's determination of 2030 demand formed a basis of its alternatives analysis. It evaluated the alternatives on their ability to meet 2030 demand. *See* O.3 at 6 ("Only those alternatives that would meet the 2010 deficit and approach meeting the 2030 deficit would be considered to meet the basis project purpose.").

The Corps argues that its miscalculation is harmless. *See* Doc. 86-1 at 16. Although no party directly briefs the issue, this argument implicates the harmless error rule.

The APA requires that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. The burden to demonstrate prejudicial error is on the party challenging the agency action. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). This harmless error rule however is not broadly applied but applies only "when a mistake of the [Corps] is one that clearly had no bearing on the procedure used or the substance of decision reached." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1071 (9th Cir. 2004); *see also Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 786 n.6 (10th Cir. 2006); *Conservation Law Found. v. Evans*, 360 F.3d 21, 29 (1st Cir. 2004).

Regardless of whether the miscalculation amounted to harmless error, Plaintiffs do not demonstrate, nor does the record indicate, that the selection of the 960-acre project as the least environmentally damaging practicable alternative was arbitrary and capricious. As discussed *supra*, the Court has already determined that the determination of the 2010 fishing trip deficit was not arbitrary and capricious.

The ability to meet the errant 2030 deficit statistic was only one of the factors involved in the Corps's alternatives analysis. The Corps also considered each alternative's ability to meet the 2010 fishing trip deficit, the site's fishing quality and sustainability, the alternative's wetland, stream, and water quality impacts, impacts on endangered species, and construction and post-construction costs. *See AR O.3 at 28.*

The Corps eliminated the no-action alternative and the "increasing public access

to existing small lakes" as not addressing the present fishing trip deficit. *See id.* The 196-acre alternative was likewise rejected as not able to meet present or future demand and would not provide an adequate fishing experience and would have low sustainability. *See id.*

The 1,225 acre, 990-acre, and 1,300-acre alternatives were all rejected as resulting in greater environmental impacts. *See id.* at 29. The Corps rejected the 535-acre multi-lake public fishing area because of its higher construction and maintenance costs and higher post-construction water quality impacts. *See id.*

Although the Corps partially relied on the 420-acre alternative's failure to meet a sufficient percentage of the illusory 2030 deficit figure, the Corps also rejected the site because of its lower quality fishing experience, potential for higher long term management costs, and general lower ability to meet the fishing deficit. *See id.* at 28-29.

In conclusion, although the Corps erred in determining the 2030 fishing trip deficit, the Corps's utilization of the errant figure did not render their alternatives analysis under the NEPA and CWA and ultimate determination arbitrary and capricious.

### 3. *Wetland Delineation*

Plaintiffs contend that the Corps violated the CWA by verifying a wetlands delineation on insufficient evidence. Specifically, Plaintiffs aver that the Corps failed to: (1) provide sufficient explanation for the delineation, (2) explain the reductions in wetlands to be impacted, (3) consider large swaths of wetlands in the Black Creek portion of the proposed lake,

and (4) respond to Georgia DNR's criticisms. *See* Doc. 94 at 19.

In the EA, the Corps concludes that "[t]he project would require the filling and/or inundation of approximately 129 acres of wetlands and approximately 48,370 linear feet of stream channel." AR O.1 at 2. Eco-South, Inc. performed the stream delineation, which the Corps verified. AR E.7. Plaintiffs do not contest the stream delineation.

Grady County first submitted a wetlands delineation, prepared by its wetlands consultants Douglas Pope ("Pope") and Ronald Lee, to the Corps in May 2001. AR E.1. Pope, who had performed a field study, provided the Corps with a hand-drawn, unscaled sketch indicating that the project would destroy approximately 156 acres of wetlands. *See* AR E.2 at 4.

In a June 15, 2001 letter, the Corps's project manager, Thomas Fischer ("Fischer"), noted that Pope's delineation had been made in accordance with the 1987 "Corps of Engineers Wetland Delineation Manual." AR E.2 at 1. "A 'wetland' under the CWA must meet the three criteria set out in the Corp's 1987 Wetlands Delineation Manual: (1) a prevalence of hydrophytic plants, (2) hydrological conditions suited to such plants, and (3) the presence of hydric soils." *United States v. Banks*, 115 F.3d 916, 920 (11th Cir. 1997). Fischer remarked that Grady County should "have the jurisdictional wetland boundary lines . . . surveyed and superimposed on the final plat of the property." AR E.2 at 1. The purported wetlands were never surveyed, *see* AR D.1 at 2, but the Corps argues that no

regulation requires a survey. *See* Doc. 86-1 at 25.

After working with Fischer, Pope submitted a second wetland sketch depicting 105 acres of wetlands within the project site. AR D.1 at 2; E.1 at 2. The reduction of wetland acreage from 156 acres to 105 acres was based on "reclassifying several streams as ephemeral and revising their origination points." AR D.2 at 2. This reduction may also have been based on examination of "color infrared aerial photographs." AR D.1 at 2. Only one infrared photograph is in the record. AR B.2. The Corps considered the "quality of the wetland sketch" as "marginally acceptable" and "strongly encourage[d] [Grady County] to have this drawing professionally reproduced." AR D.1 at 2.

On March 15, 2004, Fischer issued an additional verification letter of Pope's wetland delineation, indicating the site contained 105 acres of wetlands. *See* AR E.3. "This verification was based on a desk-top review of information submitted by the applicant's environmental consultant at that time; and was not field verified." AR O.1 at 15.

On January 28, 2005, after a cursory site visit, Parsons provided a critique of the wetland delineation:

Unfortunately this map does not represent the full extent of all probable jurisdictional waters to be impacted by the project. Brief excursions into areas depicted only as stream bed and bank systems reveled [sic] *very significant acreages* of jurisdictional

bottomland hardwood floodplain wetland systems with adjacent connectivity that do not appear on the current jurisdictional map. With just my very cursory investigation of the site, I would estimate that the total jurisdictional wetland acreage on the site could easily increase by 50 percent and possibly even double over the existing acreage already identified as jurisdictional.

AR M.3.i. at 1.

In 2006, the wetland acreage was reduced to 103 acres. AR G.5 at 1. The Corps included a sketch of 103 acres of wetlands in the September 13, 2006 joint public notice. *Id.* at 10. This sketch is different from the one created by Pope.

The Corps contends it based the reduction from 105 to 103 acres on the review of additional documents, including infrared photographs. *See* Doc. 86-1 at 24. Its record citations, however, do not support this contention. *See id.* (citing AR D.1 at 2; G.1 at 10). There is only one infrared photograph in the record. Although the scope and context is unclear, the record also indicates that Fischer in July and August of 2006 performed "on-site field checking of aerial photography" on Sapp, Black, and Buss Creeks. AR A.1.

The Corps received comments from the EPA, Georgia DNR, and Georgia Conservancy questioning the wetland delineation. The EPA noted that: "[T]he site map on which the wetland delineation verification is based is of a very small scale, hand drawn and difficult to decipher. . . . It has been our experience that most Savannah

District verification letters are much more detailed, always referencing both wetlands and streams, and are based on more complete data." AR M.1.a. at 3.

In October 10, 2006, Parsons again criticized the wetland delineation, noting that in 1989, a division of Georgia DNR, estimated 150 acres of "jurisdictional waters would be impacted" by a proposed lake, substantially smaller than the project at issue but within the project's footprint. AR M.3.j. at 2. Furthermore, he noted that the delineation map "is crudely hand drawn and essentially non-verifiable from a field perspective." *Id.* Finally, he questioned why the map issued with the joint public notice differs from the map drafted by Pope and Lee. AR M.3.b; *cf.* G.5 at 10; E.1 at 2. The Georgia Conservancy reiterated Parsons's concerns. AR M.8.d at 7.

Grady County rejected overtures to obtain a new wetland delineation. C.2 at 1; E.6 at 3.

To address the agency comments and after reviewing "more recent aerial photography," which indicated the possibility of additional jurisdictional wetlands, the Corps organized an inter-agency on-site inspection on June 26, 2007. *See* Doc. 86-1 at 24; AR O.1 at 15. Other than one infrared photograph, *see* AR B.2, and an undated photograph marking the location of the wetlands, no other photographs are delineated as part of the record of the wetland delineation. *See* Doc. 94 at 21; AR E.

Plaintiffs contend nothing in the record "explain[s] the extent of the site visit, why these wetlands were identified so late in the

game, or whether other unidentified wetlands were still unidentified." *See* Doc. 63 at 23.

Parsons provided the most commentary regarding the visit. *See* Doc. 51-3. Parsons notes that the inspection "was conducted during a period of historic drought conditions" and was "limited in scope." *Id.* at 2-3. Parsons remarked that "[t]he inability of photo interpretation to pick up forested wetlands 3 to 5 acres in size, lack of flagged or GPS points around known jurisdictional features, and lack of explanation as to discrepancies with earlier delineations continues to plague a final delineation determination." *Id.* at 3.

Grady County argues that the visit was only meant to discover additional wetlands, not re-visit the entire area identified previously as wetlands. *See* Doc. 85-1 at 25. Grady County provides no record support for such contention.

It is clear from the record that the main criticism of the wetland delineation came from Parsons, Georgia DNR's Section 401 coordinator. The Corps downplays Parsons' commentary by arguing that Parsons did not identify any specific wetlands on site not included and the Corps has superior expertise in delineating wetlands. *See* Doc. 86-1 at 26. Moreover, the Corps argues that Plaintiffs have provided no evidence that additional jurisdictional wetlands are present, no analysis of what acreage of jurisdictional wetlands exists on the site, and no analysis of how the mitigation plan would change if additional wetlands were found on site. *See id.* at 23.

The June 2007 interagency site inspection identified 26 more acres of wetlands. AR D.6 at 1. But, the record indicates some confusion as to the amount of acreage added as the Corps indicates in another section in the record that the site visit resulted in the addition of 24 additional acres. AR O.1 at 15. The Corps issued its final wetlands delineation in August 2007, listing 129 acres of wetlands to be impacted. AR D.6. In making its ultimate determination, the Corps says it relied on the sketch by Grady County's consultants, aerial photography, and the site visit. *See* Doc. 86-1 at 25.

The Corps's determination of the amount of wetlands to be impacted is important. "Wetland protection is a distinct part of the Corps' responsibility." *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1525 (10th Cir. 1992). The Corps' regulations for Section 404 permits for the fill of wetlands make clear that "[m]ost wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1). If the wetlands at issue are deemed "important," then the Corps may not issue a permit unless the district engineer concludes that the "benefits of the proposed alteration outweigh the damage to the wetlands resource," taking into account the factors considered in the public interest review. *Id.* § 320.4(b)(4).

"The Corps is the agency charged with the responsibility of delineating wetlands . . . ." *See Stewart v. Potts*, 996 F. Supp. 668, 685 (S.D. Tex. 1998). Therefore, "[t]he

Corps is entitled to significant deference regarding its wetlands delineation." *City of Shoreacres v. Waterworth*, 332 F. Supp. 2d 992, 1018 (S.D. Tex. 2004). "The Corps' assessment of impacts to wetlands is obviously a technical matter that is within that agency's expertise and for which it is entitled to considerable deference by the Court." *Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1155 (S.D. Fla. 2005).

The explanation of the wetland delineation in this case is not a model of clarity or lucidity. Nevertheless, the Court can decipher the delineation process based on the record. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (noting that the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

As the agency charged with determining the wetland delineation, the Corps is not required to accept Parsons's opinion. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). The Corps responded to some of his concerns by noting that the Corps had "field verified that there were additional wetlands within the project site" and added them to the jurisdictional determination. AR O.1 at 39.

Although the Court may have undertaken the review differently, based on the record, the Corps did not act arbitrarily

in determining its final jurisdictional determination of 129 acres. The Court gives proper deference to the Corps's technical expertise in this matter. The record demonstrates that the Corps worked with Grady County's consultant to determine an accurate jurisdictional determination and verified the wetland delineation based on the Corps' 1987 Wetlands Delineation Manual. After agencies expressed concerns over the extent of the wetland delineation, the Corps responded by undertaking an interagency site visit, which discovered additional wetland acreage. In conclusion, based on the foregoing, the Court cannot say as a matter of law that the Corps's wetland delineation was arbitrary and capricious.

### 4. Segmentation

Plaintiffs argue that the Corps impermissibly segmented its analysis and failed to consider all connected, cumulative, and similar actions in the EA. *See* Doc. 63 at 26. Plaintiffs contend that the Corps failed to adequately consider the environmental impacts associated with the "connected" projects of replacing bridges, building a causeway, and rerouting roads that would be flooded. *See* Doc. 63 at 26-27.

An agency is required to consider connected, cumulative, or similar actions. *See* 40 C.F.R. § 1508.25. The regulation specifically references an EIS, but courts have applied the regulations to the preparation of an EA. *See id.; see also W. N.C. Alliance v. N.C. Dep't of Transp.*, 312 F. Supp. 2d 765, 773-74 (E.D.N.C. 2003). "[C]onnected actions" as those that are "closely related." 40 C.F.R. §

1508.25(a)(1).   Actions are connected if they:  "(i) Automatically trigger other actions which may require environmental impact statements;  (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously;   (iii) Are interdependent parts of a larger action and depend on the larger action for their justification."  *Id.* § 1508.25(a)(1).  Courts have applied the connected action standard to the EA context.  *See Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1028 n.13 (10th Cir. 2002).

"Cumulative actions" are those that, "when viewed with other proposed actions have cumulatively significant impacts."  40 C.F.R. § 1508.25(a)(2).  Finally, "similar actions" are those "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography."  *Id.* § 1508.25(a)(3).

The anti-segmentation rule is generally that an agency "cannot 'evade its responsibilities' under [NEPA] by 'artificially dividing a major federal action into smaller components, each without a 'significant' impact.'"  *PEACH*, 87 F.3d at 1247 (quoting *Dole*, 826 F.2d at 68).  "The hallmark of improper segmentation is the existence of two proposed actions where the proposed component action has little or no independent utility and its completion may force the larger or related project to go forward notwithstanding the environmental consequences."  *Hirt v. Richardson*, 127 F. Supp. 2d 833, 842 (W.D. Mich. 1999).

The Corps has promulgated regulations to implement NEPA in the operation of the Corps' CWA § 404 permitting program.  *See Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 399 (9th Cir. 1989) (upholding the Corps' scope regulations).  The regulations state that the NEPA analysis *should* "address the impacts of the specific activity requiring a [Department of the Army] permit and those portions of the entire project *over which the district engineer has sufficient control and responsibility to warrant Federal review.*"  33 C.F.R. § 325, App. B § 7(b)(1).  Thus, "the scope of analysis may be expanded well beyond the waters that provide the initial jurisdictional trigger."  *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1039-40 (9th Cir. 2009).

> The district engineer is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a Federal action.  These are cases where the environmental consequences of the larger project are essentially products of the Corps permit action.

33 C.F.R. § 325, App. B § 7(b)(2).  Among relevant factors to consider are the "extent to which the entire project will be within Corps jurisdiction" and the "extent of cumulative Federal control and responsibility."  *Id.* § 7(b)(2)(iii)-(iv).  "The Corps' determination of the appropriate scope of the environmental review process is entitled to

deference." *Fla. Wildlife Fed'n*, 401 F. Supp. at 1311-12.

In the joint public notice, the Corps identified that "[t]he proposed project would impact existing roads, which would require the following work: (1) realignment and extension of State Park Road, with Cedar Springs Road connecting to the extension; and (2) bridges on Highway 112 [the Sapp Creek bridge/causeway] and Gainous Road would be replaced." AR G.5 at 1.

The Corps admits to not evaluating the impact of potential, future re-routing of State Park Road and Cedar Springs Road. *See* Doc. 86-1 at 30. The Corps argues that no evidence in the record indicates that the road projects will definitely require permits from the Corps. *See id.* at 29-30. Moreover, the Corps contends that no plans have been submitted for that work and it does not have sufficient control and responsibility over the projects. *See id.* at 30.

"[R]esponsibility and control" do not, as the Corps contends, mean that the Corps would have to review only actions that would independently require permitting. *See Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 40 (D.D.C. 2000) (concluding that Corps had to consider *upland* development because the Corps's "jurisdiction encompasses the heart of the development projects" and the upland projects were "entirely conditional on the permitted activity"); *see also Potts*, 996 F. Supp. at 683 (concluding that filling of the wetland and clearing of upland forest were "interrelated and functionally interdependent as to bring the entire project within the jurisdiction of the Corps").

Yet, the Court will consider the Corps's consideration of the road and bridge projects under the impacts analysis *infra*. Plaintiffs, in their reply, argue that the road and bridge projects' effects are "indirect impacts" that the Corps failed to consider. *See* Doc. 94 at 23 (arguing that "Corps has responsibility to evaluate indirect impact regardless of its determination of jurisdictional scope"). Thus, the Court will consider the remaining arguments under its "indirect impacts" analysis *supra*. *See also O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 236-37 (5th Cir. 2007) (differentiating segmentation analysis from cumulative impacts analysis as involving consideration of *proposed*, instead of reasonably foreseeable, actions). Moreover, under the reasoning of *O'Reilly*, the record does not clearly illustrate that proposed, instead of reasonably foreseeable, plans exist for the road and bridge projects to warrant the Court's segmentation consideration.

### 5. Direct Impacts

Plaintiffs aver that the Corps failed to take a hard look at the project's direct impacts as required under NEPA. *See* Doc. 63 at 27. In the EA, the Corps must "include brief discussions . . . of the environmental impacts of the proposed action and alternatives . . . ." 40 C.F.R. § 1508.9(b). The Corps must consider the direct, indirect, and cumulative impacts on the environment when determining whether the federal action is "significant." *Id.* §§ 1508.8, 1508.27(b). Direct impacts are "caused by the action and occur at the same time and place." *Id.* § 1508.8(a). "Effects [or impacts] include[] ecological . . ., aesthetic, historic, cultural, economic,

social, or health, whether direct, indirect, or cumulative." *Id.* § 1508.8.

### a. Fish

Plaintiffs argue that the Corps failed to provide "meaningful analysis" for its conclusion that the project would have a "minor adverse impact on fish species." *See* AR O.2 at 36; *see also* Doc. 63 at 35. The project will destroy over nine miles of streams and approximately 129 acres of wetlands. AR O.1 at 2; O.3 at 36.

Plaintiffs contend that the Corps' fish impact analysis is similar to that in *Friends of the Earth*, where the court chastised the Corps for failing to "provide the basis for any" of their EA responses that the project would not harm aquatic habitat and that "fish and other organisms will move to other areas." 109 F. Supp. 2d at 38.

Plaintiffs contend the Corps should have conducted a fish survey to "determine what aquatic life would be destroyed." *See* Doc. 63 at 28-29.

In April 2008, Jan Jeffrey Hoover of ERDC suggested a comprehensive survey of the animals, presumably including the fish, in the project area. AR K.2 at 3, 5.

The Corps responds that no regulation or statute requires a fishing study and the single employee's judgment cannot be supplanted for that of the Corps as a whole. *See* Doc. 86-1 at 32.

The Corps acknowledged that the conversion of stream habitat and wetlands to a lake would directly impact aquatic species inhabiting the streams and wetlands, but determined that because the lake would be stocked and managed, there would be an overall beneficial effect to fisheries. AR O.2 at 36. Moreover, a special condition to the permit requires the submission and review of a Fisheries Management plan. *See* P.2.a at 7. The Corps also concluded that the lake would reduce pressure placed on other lakes, ponds, and streams in the area, and the dam's discharge would improve stream corridors downstream of the dam. AR O.2 at 36. The Corps did note that "[t]he streams within the project area are not large enough to support a fishery." AR O.3 at 36. The Corps also contends that stream mitigation measures will limit the overall impact on fish. *See* Doc. 86-1 at 33.

After consideration of the record, the Court concludes that the Corps's analysis on fish impacts was not arbitrary and capricious. The Corps determined that a stocked and managed 960-acre fishing lake would offset the loss in fish in the inundated streams and that the dam's discharge would actually improve habitat downstream during drought conditions. The Corps took the necessary hard look.

### b. Wildlife

Plaintiffs contend that the Corps's conclusion that the proposed lake would have a "negligible effect" on wildlife lacks meaningful analysis. *See* Doc. 63 at 29. The project would inundate 960 acres of bottomland hardwood forest. *See* AR O.3 at 49. The potential local wildlife that could be impacted includes: white-tailed deer, opossum, raccoon, gray fox, marsh rabbit, bobcat, gray squirrel, southern flying squirrel, mink, river otter, and beaver. AR O.2 at 28.

The Corps determined that "[i]t is expected that any wildlife displaced by the construction of the proposed project would relocate to similar habitats in the vicinity of the project." AR O.2 at 36. Grady County owns the 1928 acres adjacent to the property. AR O.1 at 7. Plaintiffs contend that the Corps' conclusion that the wildlife would "move on" is unsubstantiated. *See* Doc. 63 at 29.

Plaintiffs contend the Corps' analysis is similar to *Habitat Education Center, Inc. v. Bosworth*, where the court, in the context of an EIS, held the Forest Service's statement that "these forests should grow to be better nesting habitat" in its cumulative impacts analysis was not backed by meaningful supporting information. *See* 381 F. Supp. 2d 842, 852 (E.D. Wis. 2005).

In the EA, the Corps noted that the "majority of Grady County and the surrounding area is a mixture of similar hardwood bottoms, upland pine forests, and farm land." AR O.2 at 36. The Corps acknowledged that the discharge of dredged or fill material could cause a loss in breeding areas, travel corridors, and food sources. AR O.3 at 49. The Corps found that throughout the rural, undeveloped land surrounding the site there existed similar habitat available for the displaced wildlife to relocate. *See id.* The Corps also stated that the lake itself "will provide additional waterfowl habitat" and "wildlife would also inhabit areas designated as compensatory mitigation for the proposed project." *Id.*; *see also* O.2 at 36.

Based on the record, the Corps' determination that the wildlife would or could relocate to the adjoining, approximately two thousand acre property and other parts of Grady County, consisting of similar habitat, was not irrational or arbitrary, and the Corps took the requisite hard look. *See Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 956 (9th Cir. 2008) (upholding Corps's determination that wildlife would move to surrounding, similar habitat).

c.   Water Quality

Although not clearly delineated in Leon County's brief, Grady County interprets Leon County as insinuating that the Corps failed to adequately consider the project's effects on downstream water quality. *See* Docs. 62 at 17; 85-1 at 36.

During the public comment period, Leon County expressed its concerns over the project's potential effects on downstream water quality. AR O.1 at 45-46. In the EA, the Corps addresses the potential impact on water quality. The Corps explained that the lake's depth would make it drought resistant and provide for sustained downstream flows for a longer period. AR O.2 at 33. The lake would also improve water clarity from sequestration of nutrients, chemicals, and sediment. *Id.* at 34.

The permit also contains multiple conditions for water quality protection. *See* Doc. 85-1 at 37; AR P.2.a at 6-8 (special condition 14 requires creation of a detailed sediment and erosion control plan; special condition 16 requires a watershed management plan; special condition 17 requires a fisheries management plan; special conditions 22 and 23 require the

establishment of water flow and quality stations downstream; and special condition 24 requires submission and review of water quality and flow reports).

Before issuance of the permit, Grady County received a CWA Section 401 water quality certification. AR P.2.e. Section 401 of CWA requires the permit applicant to obtain water quality certification from the state. *See* 33 U.S.C. § 1341; 33 C.F.R. § 320.3.

The Corps ultimately determined that "the project would result in a minor adverse impact long-term impact [sic] to water quality in Tired Creek, and a negligible impact to water quality in the Ochlockonee River." AR O.2 at 34.

To the extent, if any, that Leon County specifically challenges the Corps' analysis of the project's impact on water quality, the Court concludes that based on the Corps's analysis in the EA, the special conditions placed in the permit and the issuance of the Section 401 water quality certification, the Corps took the requisite "hard look" on the project's impacts on water quality and its conclusions were not arbitrary and capricious.

d.  Mussels in Leon County

Leon County asserts that the Corps failed to investigate the potential downstream effects of the project on endangered species, particularly three mussel species in Leon County, amid the "critical habitat" of the Upper Ochlockonee River. *See* Doc. 62 at 8-9. The mussel species are the Shinyrayed pocketbook and Ochlockonee moccasinshell, both

endangered, and the purple bankclimber, a threatened species. *See id.*

Under the CWA, "[n]o discharge of dredged or fill material shall be permitted if it . . . [j]eopardizes the continued existence of" endangered or threatened species. 40 C.F.R. § 230.10(b)(3). NEPA requires that the Corps consider "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." *Id.* § 1508.27(b)(9).

The Corps is likewise obligated to consider the effect of permit activities on endangered species under the Endangered Species Act (ESA). Under the ESA, "[e]ach Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ." *Id.* § 1536. The ESA requires the action agency to consult with the FWS whenever a federal action "may affect" an endangered or threatened species. 50 C.F.R. § 402.14(a). Neither Plaintiffs nor Leon County raise violations of the ESA.

The FWS's determinations in ESA consultation must be given great weight by the Corps. *See* 33 C.F.R. § 320.4(c) ("The [Corps] will give full consideration to the views of the [FWS] on fish and wildlife matters . . . ."). The FWS never expressed concerns over the species survey nor any possible downstream effects. *Cf.* 50 C.F.R. § 402.13(b) (noting that FWS may suggest

modifications to the action to avoid adverse effects to listed species).

Leon County "bears a heavy burden to prove that the Corps was arbitrary and capricious in relying upon the FWS determination of a matter firmly within that agency's area of expertise." *Sierra Club*, 295 F.3d at 1222.

As part of the permit process, Grady County submitted an endangered species survey conducted by Jeffrey Zuiderveen and Carson Stringfellow dated June 10, 2005 and entitled "Report on Freshwater Mussels of the Tired Creek and its Tributaries in Grady County, GA." *See* AR O.8. The survey discovered no threatened or endangered species of mussels. *See id.* at 5.

Leon County contends the study failed to examine potential harm to any downstream mussels. *See* Doc. 62 at 10. The Corps and Grady County do not dispute that the study did not examine downstream mussels.

Although not articulated in its brief, Leon County did briefly raise the issue of the endangered mussels in its October 11, 2006 letter to the Corps. *See* AR M.6.a at 4 ("Water quality and quantity will be adversely affected . . . which will also adversely impact fish and wildlife including threatened and endangered mussels found downstream in the Ochlockonee River."). Leon County did not mention the mussels in its follow-up letter on October 18, 2007. AR M.6.b.

On October 9, 2006, the Ochlockonee River Soil and Water Conservation District ("ORSW") requested "more information concerning the dam's impact on downstream mussels" and that the FWS "should be

contacted or implored to survey the downstream segment of mussels." AR O.1 at 53.

The Corps coordinated with the FWS as required by the ESA. AR O.3 at 11. ORSW's letter preceded the FWS's opinion, dated October 20, 2006, that:

> Surveys for federally-listed threatened and endangered species conducted by the applicant's agent did not locate any listed species in the action area. In addition, the action area is not included in the proposed critical habitat for the Ochlockonee moccasinshell or any other listed mussel. Based on the information provided, no further action is required under the Endangered Species Act.

*See* AR M.2.a at 1.

Two citizens, Randall Denker and Bill Matturro, also raised concerns about mussel species of the Ochlockonee River. AR O.2 at 18-19. Both Grady County and the Corps responded to the ORSW and the citizens' concerns by deferring to the FWS opinion and also discussing measures taken to maintain water quality standards. *See* AR O.1 at 53; O.2 at 18-19.

Likewise, the Corps' ERDC in April 2008 raised questions about "[t]hreats to Ochlockonee River Basin mussels" and recommended a "comprehensive survey of plants and animals in the project area using standard sampling and reporting techniques . . .[i]ntensive sampling, habitat evaluation, and risk assessment for imperiled species within the project area and in adjacent areas;" and an "[a]ssessment of effects

34

upstream and downstream of project." AR K.2 at 3-5. It is unclear from the record why the reviewer from the ERDC did not consider the Zuiderveen and Stringfellow survey. *See* K.2 at 1. The ERDC report likewise did not address the FWS's determination of ESA compliance.

The Corps counters that the ERDC document did not examine the effects of mussels downstream, but in fact concerned species in Grady County and recognized that the lake would reduce sedimentation-a threat to downstream mussels. *See* Docs. 86-1 at 39; 106 at 17. Moreover, the Corps contends that the FWS's opinion negated any potential ERDC concerns about mussels in the project area. *See* Doc. 86-1 at 39.

Leon County accuses the FWS of not considering downstream effects. *See* Doc. 95 at 4. In its letter, the FWS noted that "the applicant's agent did not locate any listed species in the *action area*. In addition, the *action area* is not included in proposed critical habitat for the Ochlockonee moccasinshell or any other listed mussel." AR M.2.a. Leon County contends that this statement demonstrates the FWS's failure to consider Leon County. *See* Doc. 95 at 4.

Grady County argues that the Corps' determination "that the structure and design of the impoundment would result in negligible impacts on the flow rates, water quantity, and water quality downstream" implicitly demonstrates the Corps' consideration of downstream effects on Leon County. *See* Doc. 85-1 at 33. Because the effects on water quality and quantity in Leon County would be negligible, the Corps and the FWS did not need to consider the

mussel species of Leon County as it was not in the "action area." *See* Doc. 107 at 10-11. Grady County argues that the relevant regulation defined "action area" as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *See id.* at 10. The Corps also argues that because the project lake is "non-consumptive and involves no point-source input of pollutants," the project will have insignificant impacts on species in Leon County. *See* Doc. 106 at 17; *see also* AR D.2 at 4.

No individual or entity questioned the FWS's determination that no further action was required under the ESA. Moreover, although Leon County equally faults the FWS and the Corps, the FWS is not before the Court so it is impossible for the Court to inquire into the machinations behind the FWS's analysis and conclusion. *See Sierra Club*, 295 F.3d at 1222.

Leon County's reliance on *National Wildlife Federation v. Coleman* is misplaced as the case involved a claim under the ESA, the FWS opposed the project, and the record clearly demonstrated that the project would affect the endangered crane. 529 F.2d 359, 371-74 (5th Cir. 1976). Likewise, *Riverside Irrigation District v. Andrews* does not aid Leon County's argument because in *Andrews*, the Corps denied a nationwide permit to an applicant, who appealed the denial. 758 F.2d 508, 512-13 (10th Cir. 1985). The Corps concluded that reduced water flows would affect the whooping crane; thus, the project would indirectly effect the whooping crane. *Id.* at 512. The Court determined that the Corps was

required to consider effects, including indirect, of the project. *Id.* at 512-13. The record before the Court is dissimilar; the Corps has determined, based on its requisite consultation with the FWS, that no endangered mussel species will be affected and the action area was not located in the proposed critical habitat.

The Court concludes that the Corps did not act arbitrarily or capriciously in its determination that no endangered or threatened species would be impacted by the project. *See* AR O.2. at 36-37. The FWS is the authority in the field of endangered and threatened species and the Corps is justified in relying on its determination. *See D'Olive Bay Restoration & Pres. Comm.*, 513 F. Supp. 2d at 1287-89 (Corps' relied on FWS's determination of what species may be affected); *The Water Works & Sewer Bd. of the City of Birmingham v. U.S. Army Corps of Eng'rs*, 983 F. Supp. 1052, 1081-82 (N.D. Ala. 1997) (finding the Corps's consultation and reliance on FWS's opinion not arbitrary or capricious). Thus, the Corps' reliance on the FWS's determination that no further action under the ESA was required was rational.

### 6. Indirect Impacts

In addition, Plaintiffs allege that the Corps also failed to take a hard look at the indirect impacts of the fishing lake as required under NEPA. *See* Doc. 63 at 30.

> Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

40 C.F.R. § 1508.8(b). The agency action must be the proximate cause of the alleged effect in order for the agency to be responsible under NEPA. *See DOT v. Public Citizen*, 541 U.S. 752, 767 (2004).

"Reasonably foreseeable" effects are those that are "sufficiently likely to occur that a person of ordinary produce would take it into account in reaching a decision." *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992). "This determination is left to the Corps in the first instance." *Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1102 (8th Cir. 2005). "The determination of whether a future action is foreseeable turns on the specific facts of the case." *City of Oxford*, 428 F.3d at 1355 n.22 (11th Cir. 2005). The Corps need not consider potential effects that are highly speculative or indefinite. *See Marsh*, 976 F.2d at 768.

### a. Bridge Replacements

Plaintiffs, in their response/reply brief, argue that the Corps should have considered the impacts of road and bridge projects as indirect impacts of the proposed lake. *See* Doc. 94 at 23-24. The segmentation and impact analyses are separate considerations. *See* DANIEL R. MANDELKER, NEPA LAW & LITIG. § 9.11 (2011) (noting that the evaluation of environmental impacts and the inclusion of actions are different analyses). Plaintiffs aver that the Corps' approval of

the lake at a specific pool level predetermined where and how the bridges and road alignments would be constructed. *See* Doc. 94 at 29.

The Corps argues that it properly considered the potential impacts of the Sapp Creek bridge and Gainous Road bridge as indirect effects. *See* Doc. 86-1 at 30. The Corps contends that any work that would impact aquatic resources on the bridge extensions would take place within the footprint of the planned lake, except for at most 200 feet which would be above the ordinary high water mark and thus beyond the Corps' jurisdiction. *See id.* at 30-31; AR B.1 at 2; O.7. The 200 feet, however, has no support in the record. Both the bridges and the roads that will be impacted are illustrated in the record cites. *See* AR B.1 at 2; O.7.

Notwithstanding the Corps' post-hoc 200-feet designation in its briefs, the Corps took the requisite hard look at the Sapp Creek bridge. In its analysis of indirect impacts in the EA, the Corps noted that the "construction of the project would require raising the Highway 112 Sapp Creek Bridge and construction of an associated causeway." AR O.2 at 43. In its response to the Georgia Conservancy, the Corps remarked:

the wetlands and streams that would be impacted by [the construction of a causeway/bridge at SR 112 crossing of the Sapp Creek] would be located within the normal pool elevation of the 960-acre lake. Therefore, impacts to wetlands and streams that would result from the road project would have already been considered as part of the evaluation of the application for the proposed lake project, and appropriate mitigation would have been provided.

*Id.* at 11. Moreover, the Corps noted that "it would be the responsibility of the applicant to work with the Georgia DOT." AR O.1 at 45.

The Corps does not discuss the Gainous Road Bridge in the secondary/indirect impacts analysis section in the EA. *See* AR O.2 at 42-43. In response to a public comment, however, Grady County remarked that it "will assume responsibility for the replacement of the existing culvert on Gainous Road at Buss Creek and has committed to maintain traffic flow on Gainous Road during this replacement either by temporary bridge or road relocation for a new bridge." AR O.2 at 17-18.

As it does with the Sapp Creek bridge, the Corps contends that "any work associated with [the Gainous Road Bridge] that would impact aquatic resources will take place almost entirely within the footprint of the planned lake." *See* Doc. 86-1 at 31. Grady County contends that "whether [the Gainous Road bridge replacement] will be a causeway or bridge, its alignment will remain the same as the existing bridge, so there will be no additional impacts." *See* Doc. 107 at 14. Although such contention may be true, particular discussion referencing the Gainous Road bridge is missing from the Corps in the record.

In addition, the Corps argues both that the bridge projects were adequately

considered as indirect impacts but that they are also speculative. *See* Doc. 86-1 at 30-31 (contending bridge work is "purely speculative" and "reasonably foreseeable"). By definition, indirect impacts are not speculative. *See Marsh*, 976 F.2d at 768 (noting that the Corps need not consider potential effects that are highly speculative or indefinite). Moreover, the idea that an impacts analysis would be speculative loses strength when the Corps purports that such bridges would not impact more than 200 feet of "shoreline on each end of each bridge." *See* Doc. 106 at 12. Presumably, the Corps's point is that although bridge construction is foreseeable, the parameters of the project and thus the exactitudes of any impacts are speculative because no plans have been submitted.

Nevertheless, the Corps took the requisite hard look at the Sapp Creek bridge project but after promulgating that the Gainous Road bridge would need to be replaced, *see* AR G.5 at 1, the Corps never again mentions the bridge in the record.

b.   Road Realignments

The Corps and Grady County offer different arguments relevant to the road realignments.

Grady County suggests that the Corps properly considered the road projects because the Corps recognized that the project would require the realignment and extension of State Park Road, *see* AR G.5 at 1, and that development outside the lake site would require either local or federal regulation. *See* AR O.2 at 43. Although not referencing such plans in the record or in its initial brief, Grady contends that it "does not

intend to replace or reroute Cedar Springs Road and State Park Road to cross the lake—instead, Cedar Springs Road will end at the footprint of the lake as boat ramps, and State Park Road will be abandoned inside the normal pool of the lake." *See* Doc. 107 at 13. Whether sincere or not, such contention is missing in the record, and the Court will not rely on this convenient reply.

The Corps, on the other hand, admits it did not consider the road projects. *See* Doc. 86-1 at 30. It seems dubious that the bridge projects are considered indirect effects, whereas the road projects are too speculative to even mention at all. *See id.*; AR O.2 at 43 (discussing that project would "require raising the Highway 112 Sapp Creek Bridge"). This is especially the case where the only record citation indicates that the project will impact the roads, and nothing else in the record provides contrary or further guidance. AR G.5 at 1. It is now contradictory for the Corps to assert that "it is indeterminable at this point in time whether the Project will necessarily require the realignment or rerouting of State Park Road and Cedar Springs Road." *Compare* Doc. 106 at 9-10, *with* AR G.5 at 1.

NEPA, however, is not a results-driven statute nor is exhaustive analysis necessarily required for compliance. After initially recognizing the project will impact the roads and the Gainous Road bridge, the Corps never again directly addresses the matter in the record, particularly in the EA.

Yet, the Corps is not required to postulate with particularity regarding impacts of non-concrete plans. Assuming a

NEPA violation even occurred, remand is unnecessary to rectify any transgression. *Cf.* 40 C.F.R. § 1500.3 (trivial violations of NEPA do not give rise to an independent cause of action). The record demonstrates that the Corps considered the environmental impacts occurring within the footprint of the lake. In addition, the Corps recognized that any development outside the lake affecting wetlands would require additional Section 404 permitting whereas upland development would require local and state regulation. AR O.2 at 43. No definitive bridge or road project plans are in the record or have been submitted for consideration. Therefore, the Court concludes that remand for further discussion is unnecessary. *See Save Our Heritage, Inc. v. FAA*, 269 F.3d 49, 61-62 (1st Cir. 2001) ("Agency missteps too may be disregarded where it is clear that a remand 'would accomplish nothing beyond further expense and delay.'" (quoting *Kerner v. Celebrezze*, 340 F.2d 736, 740 (2d Cir. 1965))).

### c. Development

Plaintiffs and Leon County contend that the Corps failed to consider the impacts of future development around the proposed lake. *See* Docs. 62 at 15; 63 at 31. The Corps argues that it had no duty under NEPA to analyze the potential impacts of purely hypothetical future development, especially since no development plans have been submitted. *See* Doc. 86-1 at 35.

Plaintiffs rely on several statements in the record to argue that development is reasonably foreseeable. *See* Doc. 62 at 31-34. In June 2009, Richard Morgan, the Corps' project manager, stated that "[w]hile

the county *does not have specific* plans for development of the tract surrounding the proposed fishing lake at this time, it does have some *long-term* plans for such development, which might or might not require additional Section 404 permits from the Savannah District [of the Corps]." AR H.9 at 1-2 (emphasis added). Morgan went on to state that "such development, if it were to be ancillary or auxiliary to the Fishing Lake, would be considered a direct effect of the creation of the lake under the present permit." *Id.* at 2.

In July 2009, Carol Bernstein, chief of the Coastal Branch, Regulatory Division, stated in a letter that Grady County had "*long-term non-specific* plans for possible recreational or other development of that property in conjunction with the proposed fishing lake." AR H.10 at 1 (emphasis added).

Leon County cites a statement by Congressman Sanford Bishop after the permit's approval that the local residents would "soon see a 900-acre *residential* lake full of fish." *See* Doc. 62 at 16. Such statement is not in the record, however, and could not have been considered by the Corps in its evaluation as it was never before the Corps. *See id.* at 16 n.6.

Moreover, Plaintiffs and Leon County contend the history of the project demonstrates the likelihood of development. *See* Docs. 62 at 15; 63 at 31-32. Grady County initially sought a permit for the creation of a development-centered lake. AR F.1; F.2. That application was rejected, and Grady County changed its purpose to a fishing lake. With its new application,

Grady County submitted a drawing of the lake that was a similar rendition of the prior development-centered proposal. *Compare* AR F.1.a at 31-32 *with* O.7.

Leon County, the EPA, Tall Timbers, and the Georgia Conservancy all raised questions or concerns about potential development surrounding the lake. *See* AR M.1d. at 5; M.6.b at 2; M.8.d at 3; M.5.a at 3.

Grady County responded to EPA concerns by stating that "[s]ince the 1960s, Grady County's primary project purpose has been the development of a fishing lake." AR O.1 at 10. As for Tall Timbers' concerns, Grady County responded that it "has no plans to develop the property surrounding the proposed lake. Any development or impacts outside the pool of the lake would require the necessary federal and state permits." *Id*. at 51.

Grady County owned and operated the area as a park for over thirty years prior to its permit applications. *See id*. at 20. Grady County contends its original intent was to develop a fishing lake, *see id*. at 10, and only amended its plans to include an economic development component in order to obtain funding from the "OneGeorgia" program. AR C.5 at 1-2; *see* Doc. 85-1 at 43. After such funding fell through, Grady County revised its application. AR C.5 at 2.

Plaintiffs dispute Grady County's historical account, arguing that OneGeorgia denied funding seventeen months before Grady County submitted the May 2005 application for a development-centered lake. *See* Doc. 94 at 27. Plaintiffs aver that Grady County only changed the project after the

Corps requested that Grady County change its project purpose. *See id*. Assuming its truth, this assertion actually weakens Plaintiffs' argument as it would demonstrate the Corps's aim for a non-development oriented fishing lake.

Grady County contends that the letter did not end its independent efforts to secure funding. *See* Doc. 107 at 16. The letter put forth by Plaintiffs is not part of the administrative record. Nothing in the record disputes Grady County's historical account.

In the EA, the Corps recognized that "[a]ny project that provides recreational water opportunities may attract both residential and commercial developers. However there is no evidence to confirm that assertion for the subject project." AR O.2 at 42. The Corps noted that any developer's ability to impact the area would be minimized by Grady County's ownership of the property adjacent to the lake. *See id*. The Corps then remarked that proposed boat ramps and fishing piers would "not impact any additional jurisdictional waters." *Id*. The Corps did recognize that "it is likely that a lake of this size would attract residential and/or commercial development on nearby lands located outside of county owned property." *Id*. at 32. The Corps determined that development of the upland resources would be regulated by local governments and most development activities that would occur in aquatic sites would require prior authorization pursuant to Section 404. *Id*. at 43. The Corps concluded that "there are programs in place to evaluate such impacts if they are proposed." *Id*.

Moreover, special condition sixteen of the permit prohibits any future development within 100 feet of the lake. AR P.2.a at 6. Plaintiffs and Leon County harp on the fact that no other covenant, restriction or easement prevents development beyond the 100 foot buffer. *See* Docs. 62 at 16; 63 at 32. They also point out Grady County's refusal to place a conservation easement on the entire adjacent property. AR O.1 at 54.

Plaintiffs even contend that the mitigation plan's preservation of wetlands owned by Grady County implicitly demonstrates the Corps' worries over future development. *See* Doc. 94 at 28. Grady County contends such argument is meritless as "preservation of government-owned lands for mitigation was permitted practice prior to the implementation of the MOA cited by Plaintiffs, and Grady County's proposal was grandfathered under that rule." *See* Doc. 107 at 17. The Court finds no justification for this argument by Plaintiffs.

Leon County objects that nothing prevents Grady County from allowing the installation of septic tanks outside the buffer zones and no study had been conducted to determine the potential effects on downstream water quality of possible development. *See* Doc. 62 at 16-17.

The Court rejects Leon County's specific objection regarding septic tanks as too speculative. The Corps would have had to guess where potential septic tanks could or would be located in a hypothetical development.

Plaintiffs argue that this case is similar to *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985) and *Florida Wildlife Federation*

*v. U.S. Army Corps of Engineers*, 401 F. Supp. 2d 1298 (S.D. Fla. 2005). *See* Doc. 63 at 33.

In *Marsh*, the First Circuit held that the Corps and the FAA should have considered the effects of industrial development on an island because the record was clear that development was an element of the overall plan, the record contained plans providing sufficient enough detail for analysis, and development was inevitable because of the construction of a causeway and port. 769 F.2d at 877-880.

The *Marsh* court provides guidance over whether an "impact" is speculative:

> Whether a particular set of impacts is definite enough to take into account, or too speculative to warrant consideration, reflects several different factors. With what confidence can one say that the impacts are likely to occur? Can one describe them 'now' with sufficient specificity to make their consideration useful? If the decisionmaker does not take them into account 'now,' will the decisionmaker be able to take account of them before the agency is so firmly committed to the project that further environmental knowledge, as a practical matter, will prove irrelevant to the government's decision

*Marsh*, 769 F.2d at 878.

In *Florida Wildlife Federation*, the district court held that the Corps failed to take a hard look at the growth-inducing effects of a proposed project. 401 F. Supp.

2d at 1326. The Corps had denied any causal link between the project and any future development, but the record clearly demonstrated future development contingent on the project. *See id.* at 1324-26.

The circumstances and the Corps's analysis here, however, is more closely analogous to that in *Georgia River Network v. U.S. Army Corps of Engineers*, where the Corps reviewed the county applicant's land use plan, noted that the project was protected by a buffer and that development affecting aquatic sites would require a Section 404 permit. *See* 334 F. Supp. 2d 1329, 1345 (N.D. Ga. 2003).

Here, the Corps required a 100 foot buffer around the lake site, noted that upland development would be regulated by the local government and that Section 404 permits may be required for any development affecting aquatic sites. AR O.2 at 42-43. Moreover, special condition sixteen of the permit requires Grady County to submit and have approved a Master Lake Development plan before construction begins on the project. P.2.a at 6. Likewise, Grady County's ownership of the surrounding property impedes the possibility of private development. AR O.2 at 96.

Moreover, no concrete development plans or proposals were before the Corps to review or consider. *Ga. River Network*, 334 F. Supp. 2d at 1345 (finding further analysis of impacts to be speculative where "[n]othing on the record reveals any plans or proposals to develop the lands around the Reservoir"); *see also TOMAC v. Norton*, 240 F. Supp. 2d 45, 52 (D.D.C. 2003) (stating that agency does not have to

speculate about projects not already in the planning stages); *Hoosier Envtl. Council, Inc. v. U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953, 979 (S.D. Ind. 2000) (finding no arbitrariness in Corps's decision not to consider secondary development where comments revealed mere allegations that development would occur without any evidence that a concrete development was then contemplated). Prior development plans had been rejected or withdrawn before the election of the present project purpose. *See* AR F.1; F.2.

Yet, Plaintiffs and Leon County would have the Corps second-guess Grady County's repeated contentions that it has no current plans for development. The Corps's EA analysis and statements of employees indicates that the Corps did not simply conclude that no development would ever occur. AR H.9 at 1-2; H.10 at 1; O.2 at 42-43. But, such long-term and non-specific plans are too speculative for the Corps's to "describe them now with sufficient specificity to make their consideration useful." *Marsh*, 769 F.2d at 878.

"The inquiry into whether a future action is foreseeable should be conducted with an eye toward the purposes underlying NEPA." *Oxford*, 428 F.3d at 1353. Currently, the parameters of any future development would involve guesswork. Requiring the Corps to undertake such analysis would "contravene[] the NEPA purposes of providing the agency and the public with accurate and relevant information" *Id.* at 1356.

Therefore, the Court concludes that the Corps did not fail to take the necessary hard look and was not arbitrary or capricious in

its analysis of future development around the project.

### d.  Historical/Cultural Sites

Plaintiffs argue that the Corps failed to assess the indirect impacts on historic and cultural sites surrounding the proposed project. *See* Doc. 63 at 34. The Corps is required to consider the project's impacts on historic and cultural sites. 40 C.F.R. § 1508.8(b); *see also* 33 C.F.R. § 320.4(e) (requiring consideration of these impacts).

Section 106 of the National Historical Preservation Act ("NHPA") requires that the Corps "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" before issuing the permit. 16 U.S.C. § 470f.

Grady County commissioned a "Cultural Resources Literature Review and Reconnaissance Survey" of the proposed lake site in 2005 to "determine if state recognized cultural resources are located in the project area." AR O.14 at 2.

Subsequently, in June 2007, R.S. Webb & Associates conducted a "Phase I Cultural Resources Survey." AR H.2. The Phase I survey identified multiple archaeological sites, eight of which were potentially eligible for listing on the National Register of Historic Places, along with four sites whose eligibility was undetermined. *See* AR H.2 at 4.

In November 2006, the Corps informed Grady County:

> An intensive Phase I survey will be required for the entire project area; this includes the proposed lake site and all other properties owned by Grady County that are contiguous with the lake site. This survey must also consider all indirect impact[s] the proposed project may have on cultural resources that may be located near the project site, on adjacent private property.

*See* AR D.5 at 4.

In October 2007, the Corps' Archaeologist and Historic Preservation Specialist, Dave Crampton, instructed that "[n]ormally we would request a buffer area around such a impoundment, and would request that it be surveyed for historic properties . . . as well as the impoundment area itself." AR H.4 at 1. Crampton further stated that if "the county plans recreational usage for this reservoir, complete with recreational facilities, particularly any that require any sorts of infrastructure, such as access roads, boat ramps, utilities services, picknicking, camping, or sporting facilities, then all of those areas should be included within the [area of potential effect] for the undertaking." *Id.*

In May 2008, R.S. Webb & Associates completed the Phase II cultural resources survey, in which it examined the twelve sites delineated in the Phase I survey and determined that three sites were eligible for listing on the National Register. *See* AR O.17-O.18; AR H.6.

Grady County never conducted the historic and cultural resource survey of the property surrounding the proposed lake. *See* AR H.10. at 1-2. The Corps counters that a survey covering all the land abutting the

proposed lake was not required. *See* Doc. 86-1 at 36. The Corps postponed the "identification of historic properties" within the surrounding Grady County-owned property until development of that property "comes closer to fruition." *See* AR H.10 at 2.

Pursuant to the NHPA, the Corps, Grady County, and the State of Georgia's Historic Preservation Division executed a Programmatic Agreement ("PA") in August 2009. AR P.2.b. The PA "outlines procedures for the eventual identification of historic properties within the larger 1,933-acre tract . . . if and when development of that tract comes closer to fruition." AR H.10 at 2.

Importantly, regarding potential future impact on historic and cultural resources, the PA requires:

> Prior to any future development of ancillary or other facilities on the Grady County property surrounding the periphery of the proposed fishing lake . . . Grady County will conduct a cultural resources survey of the property/areas to be developed or affected by the proposed development, and will consult the GASHPO and Savannah District, USACE . . . concerning the results of the survey."

AR P.2.b at 10.

Special condition 2 of the permit requires that "[p]rior to beginning construction of the dam, the permittee shall implement and comply with all stipulations contained in the . . . Programmatic Agreement, submitted to the Advisory

Council on Historic Preservation." AR P.2a at 3. Likewise, special condition 4 requires that "[a]ll dredged or borrowed material used as fill on this project" shall be "free from cultural resources." *See id.* at 4.

Ultimately, in the EA, the Corps determined that the project would have "minor adverse impacts to historical, archaeological, and architectural resources." AR O.2 at 31.

Based on the PA and the Corps' conclusion that development was not reasonably foreseeable, the Corps did not act arbitrarily and capriciously in determining that the project would have "minor adverse impacts to historical, archaeological, and architectural resources." Moreover, the PA specifically accounts for any future impacts on historic and cultural properties because of ancillary development on the adjacent Grady County-owned land. Thus, the Corps did not fail to take the requisite hard look at the indirect impacts on historic and cultural sites.

e.   Lake Iamonia

Leon County contends that the Corps failed to sufficiently evaluate the effect of the project on Lake Iamonia. *See* Doc. 62 at 18.

Tired Creek "extends approximately 16 miles, where it flows into the Ochlockonee River. The Ochlockonee River flows from Georgia into Florida, and is a primary source of water for Lake Iamonia . . . ." AR O.3 at 11. Lake Iamonia receives much of its water from the Ochlockonee River only during flood events. AR O.1 at 49. The Corps admits a connection exists between the Ochlockonee River and Lake Iamonia.

*See* Docs. 43-1 at 10; 84 at 6 (admitting that "Lake Iamonia is fed by flood waters of the Ochlocknee River"); 61 at 3; 87 at 3

Leon County raised its concerns regarding the project's effect on Lake Iamonia during the public comment period. In an October 11, 2006 letter, Leon County commented:

> Much of the water in Lake Iamonia comes from overflow conditions on the Ochlocknee that result in periodic river water breaches over several small levees to the west of the lake. The river must hit a certain flow stage to achieve these recharges. . . . If the Ochlocknee's flow is diminished during otherwise overflow events, Lake Iamonia's recharge may be reduced or even eliminated, threatening the existence, much less the health, of the lake.

M.6.a at 3-4; *see also* AR O.1 at 49.

By letter on January 26, 2007, the Corps requested that Grady County "provide additional information with regard to the potential for this project to adversely impact flows into Lake Iamonia." *See* Doc. 51-2 at 1. But, the Corps also noted: "[W]e do not believe that floods of this magnitude would be impacted by the proposed reservoir; the reservoir would not have sufficient flood storage." *See id.*

Grady County responded that "the supposed hydrologic connection between the proposed Tired Creek Lake and the 'floodwaters that fill up Lake Iamonia' was never substantiated." AR O.1 at 49. Grady County contends this statement does not

disavow a connection between the Ochlocknee River and Lake Iamonia but only disputes a "material connection between the Tired Creek lake and Lake Iamonia." *See* Doc. 85-1 at 35.

To evaluate the project's potential effect on downstream water quantity, Grady County contracted with Schnabel Engineering in 2005 to conduct a downstream flow study. *See* AR O.13. In January 2007, the Corps' hydraulic engineer, Joseph Hoke ("Hoke"), reviewed and verified the results of the Schnabel report. *See* AR L.3 at 4. Moreover, Hoke considered and addressed the concerns raised by Leon County, the EPA, Georgia DNR, and the Southern Environmental Law Center ("SELC"). *See id.* at 4-6. In May 2010, Hoke addressed and rebutted continued concerns expressed by the SELC. *See* AR L.4. The Corps "reviewed all available information and determined that the proposed project would minimally impact flow rates in the Ochlocknee River." AR O.1 at 49.

The Corps argues that its "conclusion that Lake Iamonia would not be significantly impacted was based on the incredibly minimal effect the Project will have on the Ochlocknee River's flows in Leon County." *See* Doc. 86-1 at 40.

Based on the Schnabel report, Grady County and the Corps contend that the non-consumptive fishing lake would decrease the flow in the Ochlocknee River by no more than 0.2 percent at the Route 12 bridge in Leon County, near the Georgia-Florida state line. AR O.1 at 20; *see also* Docs. 85-1 at 33-34; 86-1 at 39-41.

The record illustrates that the Corps interpreted the Schnabel report as finding that "the proposed project should have less than a 0.2 percent impact on the Ochlockonee River flow rate during periods of *drought*." AR O.1 at 48.  The total water flowing into the Ochlockonee River from the Tired Creek Reservoir is just 2.8% of the total water in the Ochlockonee River at the Georgia-Florida state line.  AR O.1 at 48.

Leon County contends that even the slightest reduction in the amount of water flowing into the Ochlockonee River during a flood event can result in a significant reduction in the overall amount of water flowing into Lake Iamonia.  *See* Doc. 62 at 19.  Yet, it is unclear which figure Leon County wishes to utilize in this attack. *Compare* Doc. 62 at 18-21 (utilizing 2.8% figure) *with* Doc. 95 at 6 ("[T]he Corps has simply decided that the 0.2 percent decline in volume of the Ochlockonee River caused by the Project is 'far from significant impact', and thus is not worth looking into.").  The disparities in the two figures, and their potential results, are significant.

In addition, the Corps observes that the Ochlockonee River is not the sole source of water to Lake Iamonia.  *See* Doc. 86-1 at 40.  The lake's other source of water, rainfall, would naturally be unaffected by the project. *See id.*  Such rationale however is not found in the record.  Grady County points out that special condition 22 of the permit ensures that the effects on downstream water quantity will be negligible because it requires the establishment of continuous flow monitoring stations downstream of the dam.  *See* AR P.2a at 7.

Furthermore, the Corps argues that Leon County has neither produced scientific evidence to substantiate its claim, nor presented any competent evidence about Lake Iamonia's hydrology during the public comment period.  *See* Doc. 86-1 at 40-41.

Leon County purports to fill this evidentiary gap with its supplemental evidence, two maps, but these maps were never before the Corps.  *See* Docs. 55-1; 95 at 7-8.  Moreover, such maps do not demonstrate the effect of the project on Lake Iamonia.

Leon County also contends that the Corps failed to consider and evaluate their concerns and completely deferred to the Schnabel report.  *See* Doc. 95 at 7.  This contention is contradicted by the record where the Corps' own hydraulic engineer evaluated the Schnabel report and considered and addressed each of Leon County's concerns, concluding that the Tired Creek lake would have insufficient flood storage to affect the floods that regenerated Lake Iamonia.  AR L.3 at 4-6.

The Court concludes that the Corps took the requisite hard look at the project's impacts on Lake Iamonia.  The Corps considered and responded to Leon County's concerns, and the Corps' own hydraulic engineer determined that the Tired Creek reservoir lacked sufficient flood storage to affect Lake Iamonia.  Likewise, Hoke verified the Schnabel report and its conclusions that the project would have a minimal effect on downstream water quantity.  These determinations are matters given great deference by the Court as they involve the Corps's technical expertise.

Thus, the Corps did not act arbitrarily and capriciously in "determin[ing] that the proposed project would minimally impact flow rates in the Ochlockonee River." *See* AR O.1 at 49.

### 7. *FONSI*

Finally, Plaintiffs argue that the Corps violated NEPA by not preparing an EIS. *See* Doc. 63 at 35. Plaintiffs contend that because the need for the project, the amount of wetlands impacted, and the mitigation plan are controversial, the Corps should have prepared an EIS. *See id.* at 35-41.

NEPA requires the preparation of an EIS where the impact to the environment is significant. 42 U.S.C. § 4332(C). "Significantly as used in NEPA requires considerations of both context and intensity . . . ." 40 C.F.R. § 1508.27. Intensity "refers to the severity of the impact." *Id.* § 1508.27 (b). In evaluating intensity, agencies are instructed to consider 10 factors, including "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." *Id.* § 1508.27 (b)(4).

"Controversial" means more than "some public opposition to a particular use." *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 234 (5th Cir. 2006). "An action is highly controversial when there is a substantial dispute about the size, nature or effect of a federal action rather than the existence of opposition to a use." *Ga. River Network*, 334 F. Supp. 2d at 1338 (citing *Friends of the Earth,* 109 F. Supp. 2d at 43).

"To succeed on this argument, Plaintiffs must first demonstrate a substantial dispute concerning the size, nature, or effect of the proposed action; if so, the agency then must consider the dispute and address the concerns in its final decision." *Ga. River Network*, 334 F. Supp.2d at 1338 (citing *Ind. Forest Alliance, Inv. v. U.S. Forest Serv.*, 325 F.3d 851, 858 (7th Cir. 2003)).

In *Ga. River Network*, the district court held that the project was not highly controversial because the Corps had provided extensive responses to agency concerns in an EA. 334 F. Supp. 2d at 1338.

In the EA, the Corps remarked that there did not appear to be a "high level of public concern, opposition or controversy associated with the proposal." AR O.1 at 31.

Although the Corps partially misinterpreted the concept of "controversy" in a reply to the EPA, *see* AR O.1 at 31 (equating "controversy" with public support), Plaintiffs have not demonstrated that the project need, wetland delineation, and mitigation plan were "highly controversial" requiring preparation of an EIS.

#### a. Project Need

Plaintiffs contend the need for the project is highly controversial. *See* Doc. 63 at 37.

In April 2008, the Corps' ERDC noted that Maceina's 2007 fishing study was "flawed in its assumptions and probably represents an overestimate of need." AR K.2 at 4. In an April 20, 2010 letter, the EPA expressed to the Corps that it "continue[d] to have significant concerns about th[e] project purpose, particularly regarding what the applicant considers as a

'sufficient size,' as well as, what has been modeled to be the current and future fishing demand for Grady County." AR M.1.d at 4. The EPA also recommended that the Corps prepare an EIS where it would "conduct a detailed evaluation of [Grady County]'s fishing needs models." *Id.*

Grady County contends that as in *Ga. River Network,* the Corps "considered the critiques, addressed them, and resolved them." *See* Doc. 85-1 at 49.

On April 30, 2010, Grady County and the Corps met with the EPA, Georgia Environmental Protection Division, and Florida Department of Environmental Protection. AR O.2 at 25. The EPA aired its concerns over Grady County's "ability to afford construction, operation and management of the proposed lake, and potential project related water quality impacts." *Id.* The project need was not apparently addressed or raised by the EPA. After the Corps decided to issue a provisional permit, the EPA, via letter, expressed that it would "not elevate this permit for review under our Clean Water Act (CWA) Section 404(c) authority. AR M.1.d at 1.

The Corps argues that 40 C.F.R. § 1508.27(b)(4) does not apply to the needs analysis but only to whether a project's *impacts* are significant. *See* Doc. 86-1 at 42-43. The Corps contends that it adequately responded to concerns over project need because it respected Grady County's purpose and need. *See id.* at 43. Likewise, the Georgia DNR validated the methodology used by Maceina, and Maceina's studies all demonstrated need. *See id.* Moreover, the

Corps responded to agency concerns by requiring an additional fishing demand study, one that examined the unmet fishing demand within Grady County alone. *See* AR O.1 at 5.

As espoused by the Corps, a Court will deem environmental *effects* or *impacts* to be "controversial." *See, e.g., Soc'y Hill Towers Owners' Ass'n v. Rendell,* 210 F.3d 168, 184 (3d Cir. 2000) (finding no controversy because plaintiffs dispute project's location, not effects, and citing that "controversy" is only one of ten factors to be considered).

Moreover, even assuming that Plaintiffs have demonstrated a substantial dispute regarding the project size, the Corps responded to such concerns by requiring Grady County to conduct an additional study focused on demand within the county alone and then adjusted the study's conclusions to respond to EPA concerns over declining fishing license sales. *See Wetlands Action Network v. U.S. Army Corps of Eng'rs,* 222 F.3d 1105, 1120-21 (9th Cir. 2000) ("Where the record reveals that an agency based a FONSI upon relevant and substantial data, the fact that there is evidence supporting a different scientific opinion in the record does not render the agency decision arbitrary and capricious.").

Thus, Plaintiffs have not proven that such controversy continued to exist over the project need to require the preparation of an EIS.

b.   Wetland Delineation

Plaintiffs also argue that the amount of wetlands to be impacted is highly controversial as both the EPA and Georgia DNR raised substantial concerns over the

Corps' assessment of wetlands to be impacted. *See* Doc. 63 at 38. The EPA critiqued both the wetland sketch and the Corps's ensuing verification of the wetland delineation based on the sketch. *See* AR M.1.a at 3. Parsons at the Georgia DNR also raised questions about the number of wetlands delineated and provided commentary on the interagency site visit. *See* AR M.3.j at 2; Doc. 51-3.

Grady County contends that any "controversy" was resolved by the Corps' "numerous site visits" to examine the area soils and "document reviews." *See* Doc. 85-1 at 50. The Corps agrees that it "carefully analyzed the question of wetlands delineation and responded to public comments on the topic." *See* Doc. 86-1 at 43.

The wetlands delineation process has already been discussed. Assuming a substantial dispute over the effect of the project on wetlands existed, the Corps's inter-agency site visit and subsequent upward revision of the wetland delineation sufficiently responded to and ameliorated any such dispute. The Corps is entitled to substantial deference to its jurisdictional determinations and is entitled to rely on its own experts. In his post-visit commentary, Parsons, who attended and participated in the site-visit, does not present substantial evidence or data indicating additional wetland acreage not accounted for in the final delineation. Therefore, the Court concludes no controversy existed over the wetland delineation to warrant the preparation of an EIS.

c.  Mitigation

Finally, Plaintiffs contend the mitigation plan is highly controversial. *See* Doc. 63 at 39.

During the permit process, Grady County submitted and resubmitted its mitigation plan four times before the Corps accepted it. *See* Docs. 1 at 30; 12 at 11. The final mitigation plan, dated November 2009, includes 99.26 acres of wetland restoration, 260.8 acres of wetlands preservation, 111.05 acres of wetland enhancement, 11,151 feet of stream bank restoration and enhancement, 76,835 linear feet of riparian preservation, 11,756 linear feet of riparian enhancement, and 4,853 linear feet of riparian restoration. AR O.2 at 42. The EPA, FWS and Georgia DNR expressed opposition to the plan. *See* Doc. 63 at 39; AR M.2.c at 2; M.1.c at 3; M.3.k.

The three agencies presented the Corps with specific objections to the mitigation plan, representing their concerns that the plan did not provide adequate compensation for wetland and stream impacts. The FWS, in its January 7, 2010 comments to the final mitigation plan, recommended denial of the Section 404 permit, stating that the plan was inadequate. AR M.2.c at 2. It raised issues with Grady County's alleged failure to provide "SOP worksheets," the plan's non-compliance with the 2008 Mitigation Rule and Savannah District 2004 SOP, the plan's deficient baseline and reference data, lack of a monitoring plan and success criteria, the fragmented nature of the mitigation sites, and the fact that many of the sites were privately held. *See id.* at 1.

Likewise, the EPA on January 7, 2010 commented that "[t]he revised mitigation

plan does not comply with the stated requirements and guidance," and "[t]he plan lacks detail and baseline data, and falls far short of an appropriate level of compensation for the project impacts." AR M.1.c at 3; *see also* AR M.1d. at 6-7 (reiterating concerns in April 2010). Moreover, the Georgia DNR noted on December 22, 2009 that the mitigation plan was "vague in the extreme[,] providing little quantifiable baseline information or assessment for either the impacts or the mitigation tracts." AR M.3.k at 1. In addition, the Georgia DNR raised many of the same concerns as the FWS. *See id.*

Under the Guidelines, a Section 404 permit cannot issue "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge [of fill material] on the aquatic ecosystem." 40 C.F.R. § 230.10(d); *see also* 33 C.F.R. § 320.4(r) (explaining the general mitigation policy).

One way in which the Corps can reduce the potential adverse impacts associated with filling activity is to require mitigation as a condition of a permit. *See* 33 C.F.R. § 325.4(a)(3). Mitigation includes steps to avoid or minimize the impacts of a proposed activity as well as "[c]ompensating for the impact by replacing or providing substitute resources or environments." 40 C.F.R. § 1508.20(e).

Neither party thoroughly briefs the mitigation issue, particularly the special conditions relevant to the mitigation plan.

Plaintiffs contend that the Corps requested functional assessments and wetland delineations for the mitigation sites but Grady County failed to provide them. *See* AR C.2 at 2; D.5. Yet, Grady County's consultant did provide a functional assessment for streams and wetlands on the proposed mitigation sites. *See* AR O.12; *see also* AR O.11. Moreover, Grady County was not required to perform wetland delineations for each mitigation site. AR O.3 at 63.

"NEPA only requires that the [Corps] consider other agencies' concerns, address them, and explain why it found them unpersuasive." *Hoosier Envtl. Council,* 105 F. Supp. 2d at 976. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh,* 490 U.S. at 378.

The Corps responded to the EPA's concerns regarding the mitigation plan. AR O.1 at 24-35. The Corps also responded to FWS and DNR concerns with reference to its EPA responses. *See* AR O.1 at 37, 40-43. Some of the concerns were addressed in the special conditions attached to the permit. *See* AR P.2.a at 4 (condition five requires collection of baseline data for each mitigation site; condition six requires inclusion of success criteria), 5 (requiring supplemental mitigation where site fails to meet success criteria); *see also* O.1 at 29-30 (responding to EPA stating that special conditions would address many of their concerns, "including base-line dat[a], construction plans, monitoring protocols, success criteria, contingency plans, etc.").

Moreover, on August 19, 2009, the Corps arranged "to visit each proposed mitigation site and to allow the resource agencies an opportunity to provide on-site input." AR O.1 at 24. The Corps and the Georgia DNR's EPD attended, but the EPA and FWS, although invited, did not attend. *Id.*; *see also* AR M.3.f. Based on suggestions derived from the visit, Grady County "revised the mitigation plan to increase stream buffers to the maximum extent practicable." AR O.1 at 27; M.3.f. The April 30, 2010 meeting to discuss the EPA's concerns with the project also included an on-site visit to a mitigation site. AR. O.2 at 25.

The Corps concluded: "Based on the August 19, 2009, site visit, the functional assessment provided by the applicant and all other information, it is the position of the [Corps] that the proposed mitigation plan would adequately offset unavoidable impacts to the aquatic environment that would result from the proposed project." AR O.1 at 24; *see also* O.1 at 27 (indicating that the Corps also utilized its "best professional judgment" and review of the compensatory plan in making its determination).

Although expressing reservations throughout the process while recommending the preparation of an EIS, the EPA ultimately decided to not elevate the permit for review. "The EPA is authorized to veto a § 404 permit whenever it determines that the discharge of dredged or fill material is having or will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas, . . . wildlife, or recreational areas." *Hoosier Envtl. Council,*

*Inc.*, 105 F. Supp. 2d at 971; *see also* 33 U.S.C. § 1344(c); 40 C.F.R. § 231.1(a).

Based on a review of the record, the Court concludes that the mitigation plan is not so "highly controversial" as to require preparation of an EIS. Assuming the agency's concerns presented a substantial dispute over the project's environmental effect, the Corps specifically responded to agency concerns and included special permit conditions to address many of the issues with the mitigation plan. *See* AR O.3 at 34-35 (remarking that special conditions 5-12 would make sure to "provide compensatory mitigation necessary to offset the loss in aquatic function"); *see also Madigan,* 960 F.2d at 1528-29 (accepting Corps' allowing post-permit implementation of mitigation plan). Moreover, the Corps arranged a site visit for the attendance and participation of all disputing agencies, and Grady County increased stream buffer widths based on the input gathered from this visit. Thus, Plaintiffs have not demonstrated that the mitigation plan is so controversial as to require an EIS.

## VII.   CONCLUSION

Leon County's "Motion to Consider Extra-Record Evidence," *see* Doc. 55, is **DENIED**.

Leon County's "Motion to Consider 72 Federal Register 220, 64286-64340, and 63 Federal Register 50, 12664-12687," *see* Doc. 57, is **GRANTED**.

Grady County's "Motion to Amend Answer," *see* Doc. 60, is **GRANTED**.

Plaintiffs' "Motion to Compel Completion of the Administrative Record," *see* Doc. 66, is ***GRANTED***.

Leon County's "Motion for Summary Judgment," *see* Doc. 62, is ***DENIED***.

Plaintiffs' "Motion for Summary Judgment," *see* Doc. 63, is ***DENIED***.

Grady County's "Motion for Summary Judgment," *see* Doc. 85, is ***GRANTED***.

The Corps's "Cross-Motion for Summary Judgment," *see* Doc. 86, is ***GRANTED***.

Leon County's "Motion for Judgment on the Pleadings," *see* Doc. 93, is ***DENIED***.

This 19th day of March 2012.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA